**ECF CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOCAL 456, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>Plaintiff,<br><br>-against-<br><br>ALL ROCK CRUSHING, INC,<br><br>Defendants. | Docket No. 08 Civ. 1894 (SCR)<br><br>**ANSWER, COUNTERCLAIM, AND AFFIRMATIVE DEFENSES** |

Defendant All Rock Crushing, Inc. (hereinafter referred to as "All Rock"), by and through its counsel, hereby answers the Complaint as follows:

1.      Neither denies nor admits Paragraph 1 of the Complaint and respectfully refers the Court to the statute for its content and interpretation.

2.      Neither denies nor admits Paragraph 2 of the Complaint and respectfully refers the Court to the statute for its content and interpretation.

3.      Neither denies nor admits Paragraph 3 of the Complaint and respectfully refers the Court to the statute for its content and interpretation.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4 of the Complaint.

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 of the Complaint.

6.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 of the Complaint

7.      Admits that All Rock is a corporation duly organized and existing under the laws of the State of New York and maintains an office at 465 Yorktown Road, Croton-on-

Hudson, New York in the County of Westchester and denies the purported designation of said address as its principal office.

AS AND FOR A FIRST CLAIM OF RELIEF

8.     Defendant repeats, reiterates and incorporates each and every response given to paragraphs 1 through 7 of the Complaint as if set forth fully herein.

9.     Denies the allegations contained in paragraph 9 of the Complaint and respectfully refer the Court to the terms of the collective bargaining agreement for its content and interpretation.

10.     Denies the allegations contained in paragraph 10 of the Complaint and respectfully refer the Court to the terms of the collective bargaining agreement for its content and interpretation.

11.     Denies the allegations contained in paragraph 11 of the Complaint.

12.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12.

13.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13, except admits that a hearing was conducted on November 29, 2007 with Arbitrator Susan J. Penapento at the offices of American Arbitration Association.

14.     Denies knowledge or information sufficient to form a belief as to the truth of allegations contained in paragraph 14 of the Complaint, except admits that the Arbitrator's award was mailed on or about January 15, 2008.

15.     Denies the allegation contained in paragraph 15 of the Complaint and respectfully refers the Court to the award for its content and interpretation.

16.     Denies the allegations contained in paragraph 16 of the Complaint.

<u>OBJECTION IN POINT OF LAW</u>

17.     This Court lacks jurisdiction over Defendant due to lack of service on an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service pursuant to New York's Civil Practice Law and Rules §311(a)(1).

<u>COUNTERCLAIM</u>

18.     Upon information and belief, on or about January 15, 2008, Arbitrator Susan J. Penapento issued her award and decision and served it upon counsel for the parties (hereinafter, the Decision").  A copy of the Decision is annexed hereto as Exhibit A.

19.     The Arbitrator's Decision does not contain an award of damages nor a method for calculating the purported damages.

20.     The Arbitrator did not conduct a hearing on the issue of damages nor did Plaintiff submit the necessary documents to calculate such an award during the November 29, 2007 hearing.

21.     Upon information and belief, Plaintiff has not issued a request for a hearing on the question of damages nor has the Arbitrator conducted a separate hearing on this issue.

22.     It is clear that in the absence of an actual award of damages, a request for an Order from this Court "granting judgment for Beck's back pay and benefits" is prejudicial to Defendant, who has not been heard on this issue.  As such, Plaintiff improperly and prematurely commenced the within action.

23.    Plaintiff is obligated to present the issue of damages calculations to the Arbitrator for a determination on the contractual wages and benefits owed to the grievant, an issue Plaintiff submitted for arbitration.

24.    Based on the foregoing, Plaintiff is liable to Defendant for attorneys' fees and all costs associated with defending this matter.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted because the Arbitrator's decision does not contain a computation for damages nor does it award a sum in damages and is "so imperfectly executed that a mutual, final and definite award upon the subject matter was not made" in accordance with the statutory requirement of 9 U.S.C.S. §10 and cannot be confirmed by the Court.

## SECOND AFFIRMATIVE DEFENSE

The award is beyond the scope of the Arbitrator's power and must be vacated.

## THIRD AFFIRMATIVE DEFENSE

The relief sought by Plaintiff is moot and academic; Defendant has terminated the collective bargaining agreement and shall no longer be a party to the collective bargaining agreement as of May 31, 2008.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's grievant, Jeffrey Beck, has failed to mitigate damages.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's own fraudulent conduct in that the execution of the underlying collective bargaining agreement was secured through duress and coercion.

## SIXTH AFFIRMATIVE DEFENSE

This Court lacks jurisdiction over Defendant due to lack of service on an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service.

## SEVENTH AFFIRMATIVE DEFENSE

Defendant reserves the right to assert other affirmative defenses that may be warranted as discovery proceeds, as well as any additional counterclaims.

**WHEREFORE**, Defendant All Rock Crushing, Inc. seeks judgment against Plaintiff:

(a)     dismissing its Complaint in its entirety with prejudice;

(b)     vacating and setting aside the Arbitrator's award and decision;

(c)     awarding Defendant all costs and disbursements associated with this action including reasonable attorneys fees; and

(d)     awarding Defendant such other and further relief as this Court deems just and proper.

Dated: White Plains, New York
        March 26, 2008

                                   Respectfully Submitted,

                                    _s/George Kokkalenios_____
                                   GEORGE KOKKALENIOS  (GK-1044)
                                   Law Offices of George Kokkalenios
                                   & Associates
                                   50 Main Street, Suite 1000
                                   White Plains, NY 10606
                                   (914) 682-6884

AMERICAN ARBITRATION ASSOCIATION
Case No. 13 300 02901 06

-------------------------------------------------x

Anthony Rushing, Inc.

        Employer

-and-

                                  **OPINION AND**
                                  **AWARD**

**Local 456, International Brotherhood
of Teamsters,**

        Union

Re: Failure to Utilized Referral Hall and Pay Contractual Wages

-------------------------------------------------x

Before: Susan J. Panepento, Arbitrator

Appearances:

    For the Employer:
    George S. Kokkalenios, Esq.
    Law Offices of George S. Kokkalenios

    For the Union:
    Steven H. Kern, Esq,
    Barnes, Iaccarino, Virginia, Ambinder & Shepherd, LLC

        The above-named parties designated the undersigned Arbitrator to hear this

dispute. A hearing was held in this matter on August 3, 2007 and November 29, 2007.

Both parties were advised by the American Arbitration Association (AAA) by mail of the

first hearing date, but only the Union appeared and presented evidence. After that date,

the Arbitrator advised the Employer, by letter, that the hearing had proceeded in its

absence. Sometime thereafter the Employer contacted AAA and the Arbitrator and

requested an opportunity to present evidence in this matter. After conferring with the

parties, the Arbitrator scheduled a second day of hearing. On November 29, 2007, both

parties appeared before the Arbitrator. The Employer stipulated to certain facts, agreed

to accept Union counsel's oral summary of the evidence presented at the first day of the

hearing and waived its right to cross-examine the Union's witnesses, except for rebuttal.

In addition, the Employer was given the opportunity to present testimony and evidence.

As a result, both parties were afforded a full opportunity to present witnesses, submit

evidence, and present arguments in support of their respective positions. The record was

closed upon completion of the second day of hearing. The Arbitrator fully considered all

the evidence presented and the parties' arguments in preparation and issuance of this

Opinion and Award.

## ISSUES

The parties stipulated to the following issues:

Whether the Employer violated the collective bargaining agreement by failing to utilize the union's referral hall and pay contractual wages and benefits on November 25, 2006, December 2, 2006, and December 9, 2006 and since Jeffrey Beck was laid off?

Whether the Employer failed to recognize the Union as the collective bargaining agent for its employees and/or employ union members as required by the collective bargaining agreement on November 25, 2006, December 2, 2006, and December 9, 2006, and since Jeffrey Beck was laid off?

Whether the Employer laid off Jeffrey Beck in violation of the collective bargaining agreement?

If so, what shall be the remedy?

The Employer and Union are parties to the Heavy Construction Agreement ("Agreement"), effective from June 1, 2005 through May 31, 2008.  The Employer agreed to be bound by the Agreement on January 15, 2005.  Union Ex. 2.  Relevant portions of the Agreement are set forth below:

## ARTICLE I – UNION RECOGNITION

1.   The Employer hereby recognizes the Union as the sole and exclusive collective bargaining agent for employees employed by the Employer in its present establishments or those thereafter opened by the Employer in Westchester or Putnam Counties for employees in the following classifications:
Chauffeurs on straight trucks, trailer tractors (all types), 3-axle trucks (physically load and unload), Euclids, . . . working Teamster foremen and employees in each and every classification represented by the Union.

2.   All employees covered by this Agreement, who are members of the Union, shall maintain membership in good standing in the Union as a condition of continued employment.

3.    All current and future employees covered by this Agreement, who are not members of the Union, shall become members of the Union in good standing on the ninetieth (90th) day from: (a) the date they first commenced work, (b) the date of execution of this Agreement or (c) the effective date of this Agreement, whichever is later.

$$* \quad * \quad *$$

5.  The Employer shall notify the Union in the event the Employer needs additional help, and the Union shall refer applicants without discrimination as to their membership or non-membership in the Union, and the Employers shall have the right to determine which of said persons referred by the Union shall be employed.  In due consideration to seniority with the Employer, the Employer's request for a particular person, the qualifications of the applicant to operate the equipment, the prior

experience of the applicant in the industry, the applicant's competence to perform the work and the duration of the applicant's period of unemployment.

7. The Employer agrees to contact the Union for workers either the day before or the morning of each day workers are needed, and referrals will be made according to the factors set forth above. If the Union is unable to supply workers, the Employer will be notified as soon as possible to avoid down time and to make other arrangements.

## ARTICLE IX – PAST BENEFITS

2. Work presently being performed by bargaining unit employees shall continue to be performed by bargaining unit employees in accordance with the provisions of this Agreement. Equipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of the Agreement.

## ARTICLE XXI – OUTSIDE CONTRACTS

1. The Employer shall not, during the term of this Agreement, contract or agree to contract or otherwise assign work performed by employees covered by this Agreement to any other firm, contractor, corporation, partnership, individual or otherwise, except as provided by Article VII hereof. It is agreed that employees covered by this Agreement shall continue to do all types of work heretofore performed by them. The Employer shall use employees covered hereby to transport cranes, cats or shovels.

## ARTICLE XXVI – WORKING CONDITIONS

2. (f) Restrictions: Employers may not carry fuel for equipment in fifty gallon drums or five gallon cans unless a driver is employed and the above requirements are adhered to.

*   *   *

5. The starting and checking of all trucks and equipment covered hereby shall be performed by employees covered hereunder.

6. The Employer shall use equipment covered by this Agreement and operated by employees covered hereby for the purposes of delivering materials, parts, cones, planks or any equipment or material for construction and whenever this equipment can be used, for such purposes, in the judgment of the Union delegates.

In addition, the Agreement sets forth basic minimum wages and fringe benefit contributions (Welfare, Pension, Legal Services, etc.) that the Employer must pay to or on behalf of each covered employee for each hour worked. (Article II.)

## BACKGROUND

The following facts were stipulated: The Employer is a drilling and blasting contractor. Currently, its business mainly consists of drilling and blasting stone and rock for residential purposes. While employed by the Employer, Jeffrey Beck was a driver of a tri-axle dump truck and tag-a-long trailer. During the course of his employment, Beck transported equipment and materials, such as drills, excavators and pea gravel, to and from the Employer's yard to work sites. Beck was also the Union's shop steward for the Employer. On or about December 15, 2006, Beck filed a grievance asserting that the Employer had made deliveries on the three prior Saturdays without calling Beck or another Union driver to operate the truck. In either late January or early February 2007, Beck was laid-off by the Employer and has not been rehired since.[1]

---

[1]  The Union asserted that the date of Beck's layoff was February 2, 2007. Initially, the Employer stated that it could not verify the date of layoff and asserted that it had been earlier than February 2007. Shop Steward reports, completed by Beck and submitted into evidence, indicate that Beck worked through January 27, 2007. In addition, the Employer's witness, Daniel Muro, testified that Beck was laid off in early February 2007. However, the parties agreed that determination of the date Beck last worked can be resolved when determining the remedy.

The Union presented testimony of three witnesses: Jeffrey Beck, Christopher

Ahlstedt and business agent, Kevin Curry. Beck testified that he was employed full time

by the Employer. Shop Steward reports he completed in 2006 were entered into

evidence and show that he consistently worked 40 hours a week and often worked

overtime.[2] Further, when he was not driving the truck, Beck supervised the laborers in

the yard, fueled trucks and helped with truck maintenance. Union Business Agent Kevin

Curry also testified that under the Agreement, unit members are responsible for more

than just driving the trucks. The Agreement covers work such as yard work, fueling, and

assisting with truck maintenance, etc.

Beck testified that in December 2006 he was advised by Curry to investigate and

see if the Employer was using its truck on Saturdays without a Teamster driver. Shortly

thereafter Beck asked Gabriel D'Addana, All Rock co-owner, if someone was using the

truck on weekends. According to Beck, D'Addana said, "Maybe you don't understand,

but it's my fucking truck. If I want to use it on weekends, I use it. You and your Union

brothers can kiss my butt." Beck replied that D'Addana was supposed to call him in for

overtime if they were working on weekends and told him that he had been told to look

into the issue by Curry. D'Addana said that he was not going to pay time and a half.

A few days later, Beck was called to the office after work. Present were Daniel

Muro, co-owner, Jeanette _____, the office manager, and Michelle _____, who works in

the office. Muro said to Beck, "You cause me a lot of problems. If I get one more letter

---

[2] 2006 Shop Steward reports completed by Beck show that he worked between
one and ten hours of overtime in at least 22 out of 38 reported work weeks.

from your hall about the Saturdays and the truck, you're fired. Get out." The Grievant replied that he was just doing what he was told to do. Muro responded, "Just get out."

Sometime in January, D'Addana told Beck that he had to accept cash for his overtime work. Beck replied that he couldn't take cash. D'Addana then said, "Well then, they'll be some changes here." According to Beck, when he went to the office to pick up his paycheck on February 2, 2007, he was met by Muro, who handed him two envelopes and said, "This is your pay and this is your last week." Beck replied, "What happened? There is work." Muro said, "I told you, I'm not dealing with you, I'm not dealing with the Teamsters. I have no work for you." Beck recalled that Muro also said something like – "you cost me a lot."

Beck testified that after February 2, 2007, there was still delivery work that needed to be done at a location in Rye/Harrison, New York where he had delivered a drill just prior to his layoff. In addition, Beck was told by other drivers that they had seen the All Rock truck on jobsites on weekends from December 2006 to February 2007. After February 2007, Beck observed D'Addana driving the All Rock truck or flat bed to various work sites. Specifically, on May 7, 2007, Beck saw D'Addana drop an excavator at a residence; on May 8, 2007, he saw D'Addana bring a trailer into the yard; on May 11, 2007, Beck saw D'Addana driving the 3-axle truck in Montrose, N.Y.; on May 22, 2007, he saw D'Addana driving a truck filled with dirt in Chappaqua, N.Y.; and late in May 2007 he saw D'Addana driving the truck in Harrison, N.Y. In addition, Beck observed All Rock employees working on a job site in Mahopac, N.Y. in late June 2007.

Beck testified that he has driven by the yard at least once a week since his layoff and each time he observed employees and materials in the All Rock yard.

Curry testified that he was informed by some unemployed Teamsters in December 2006 that All Rock was making weekend deliveries without a Teamster driver. As a result, he called Beck and asked him to ask Muro about it. Beck reported back to him that D'Addana told him it was none of his business. Curry instructed Beck to file grievances for three Saturdays. Subsequently, Curry spoke to Muro on the phone and Muro told him that he had no more work for Teamsters. Curry asked him if he was going out of business and Muro said, "No." Sometime thereafter, Curry tried to set up a meeting with Muro to discuss the issue further, and Muro refused and told him, "Screw you." These conversations occurred before Beck was laid off. After Beck was laid off, Curry, who regularly visits job sites in Westchester and Putnam counties, continued to see the Employer's drills and trucks at jobsites on a regular basis.

Christopher Ahlstedt, a former All Rock employee, testified that he is a driver for a fuel company and has been delivering fuel to construction sites in Westchester and Putnam counties since before February 2007. Therefore, he is on construction sites in Westchester and Putnam counties daily. After Beck was laid off, Ahlstedt testified that he frequently saw All Rock trucks and employees on construction sites performing blasting and drilling work. Ahlstedt stated that he saw D'Addana driving the All Rock truck on construction sites over 100 times since February 2007

Both Muro and D'Addana testified on behalf of the Employer. Muro testified that when he established All Rock Crushing in 1999, the business objective was to engage in

rock crushing and processing." In 2002, Muro's partner left the business and Muro gave

50% of the shares of the Employer to his nephew, D'Addana, who became the company
president. Muro retained 50% of the shares and became vice-president. Thereafter, the
nature of the business changed to drilling and blasting and the crushing operation was
diminished. According to Muro, crushing is currently only a very small fraction of the
Employer's work. Muro stated that the Employer also does some minor material sales to
small contractors or landscapers. This work involves only storing and sorting stone. The
Employer no longer delivers or transports stone.

Muro testified that after 2002, D'Addana took over the "main management" of
the business and the amount of work that the business performed decreased due to
aggressive competition. As a result, the Employer suffered financial problems. Muro
stated that he could no longer afford to keep Beck due to these financial difficulties.
Around February 2, 2007, Muro told Beck that he was laid off and gave him his final pay.

Muro testified that since Beck's layoff, work has been "scarce." There have been
2-3 month periods when the Employer has had no blasting work. Further, the Employer
has not had any large jobs, only one medium job and a few small jobs involving mostly
drilling. In addition, he said that the Employer is "turning away from Union jobs,"
"downsizing and restructuring."

In sum, Muro stated that since February 2007, the work the Employer has
performed did not require employment of a Teamster. With only one or two work sites
in progress at a time, there was no need for a driver to move equipment between work

---

[3]  Initially, Muro co-owned the company with Bruce Fiorino.

sites." Initially, Muro testified that since its inception, only 5% of the Employer's work

required use of the truck to transport equipment. Later in his testimony, he stated that

before 2001, the Employer had lots of work and the truck was used to move equipment 2-

3 days a week, whereas now a drill is moved only once a week or less often. Also, Muro

stated that lately other contractors move his drills from site to site. Often these

contractors employ Teamster drivers who transport his drill between work sites. For

example, Joachim Construction moved All Rock's drill after Beck was laid off. Further,

Muro explained that the All Rock drillers and blasters keep tanks of fuel in their trucks

and refuel the drills/excavators on the work sites.

With respect to the three Saturdays in 2006, when the Union claims the Company

should have called Beck to drive the truck, Muro stated that Beck knew that D'Addana

was using the truck on those dates to do some work at his home. Further, Muro stated

that he had been unhappy about receiving Beck's grievance, and acknowledged telling

Beck that he didn't want to hear about it. When asked why he did not tell Curry what

the truck was being used for, Muro replied that Curry did not call him until after the fact.

Muro also claimed that Curry had threatened him.

With respect to the parties' Agreement, Muro gave varying accounts of why he

signed the Agreement. Initially, he stated that he signed the Agreement after meeting

with the Union president at the Union office. At that time, the president told him that he

needed to have a Teamster driver, but he did not have to employ the driver full-time.

---

[4] Muro also stated that there are four other blasting contractors who operate
without a Teamster.

Sometime after signing the Agreement, Muro said he was told by the Union that he needed to employ a Teamster full-time, and had to pay him 40 hours per week.] Later in his testimony, Muro said that he was forced to sign the Agreement because Union representatives sat in his office and said that they would not leave until he signed the Agreement.

D'Addana testified that he is responsible for estimating jobs, laying out the work and moving equipment. On two of the Saturdays in issue, (he was not certain which ones), he used the All Rock truck to pick-up gravel and soil and deliver it to his house to complete his driveway. D'Addana stated that since Beck's layoff, he has driven the truck and trailer to deliver equipment including drills to job sites. He was not certain how many times he used the truck to deliver equipment, but stated it was more than once or twice and could have been, "30, 40 or 50 times."

## POSITIONS OF THE PARTIES

### The Union

The Union argues that the Employer has violated the parties' Agreement in several ways. First, in Article I, Section 1 of the Agreement, the Employer agreed to recognize the Union as the collective bargaining agent for its employees who drive tractor trailers and 3-axle trucks, yardmen, helpers, employees who drive pick-up trucks and fuel trucks ("covered employees.") By its failure to employ any employees who are members of the Union to perform these duties on November 27, December 2, and

December 9, 2006 and continuously since February 2, 2007, the Employer has violated this provision of the Agreement. There is no dispute that the Employer has continued to operate its business and that at a minimum its operation requires the use of a truck and trailer to transport drills.

Second, the Union argues that the Employer has violated Article I, Sections 2 and 3 of the Agreement, by failing to employ employees who are or who become members of the Union to perform work covered by the Agreement. Article I, Sections 2 and 3 require employees who perform covered work to become and maintain membership in good standing in the Union.

Third, Article I, Sections 5-7 require the Employer to utilize the Union's referral system to obtain employees who operate equipment or perform services covered by the Agreement. The Employer's failure to contact the Union to obtain a Teamster to drive the truck and trailer on November 27, December 2, and December 9, 2006 and continuously since February 2, 2007 violates these provisions.

The Union argues that the Employer has continued to operate its business and in so doing has performed drilling and blasting work which required the use of an employee covered by the Agreement. The Union notes that the Agreement covers both yardmen and fuel truck drivers and the Employer did not state that there was none of this work available. To the contrary, Muro testified that drillers and blasters carried 100 gallon tanks of fuel in their trucks. Article XXVI, Section 2(f) of the Agreement expressly prohibits the Employer from carrying fuel for equipment unless a driver is employed. Further, Muro testified that the Employer still sorts stone for landscapers, work that is

performed by yardmen. Finally, the Union argues that the Employer cannot use other contractors to perform work that it covered under the Agreement. Muro testified that the Employer has used other contractors such as Joachim to transport the All Rock drill between job sites. Article XXI of the Agreement prohibits the Employer from assigning work performed by employees covered by the Agreement to any other firm, contractor or corporation.

In sum, the Union argues that it has established violations of the Agreement. It contends that to prove its case it does not have the burden to show each and every instance that the Employer performed covered work, but failed to employ a Teamster and/or utilize the Union's referral service. The nature of the Employer's drilling and blasting operation requires the movement of equipment and materials to and from worksites and the Employer's yard. It is illogical to conclude that the work could be completed otherwise. The Union provided some specific examples of work that the Employer performed since February 2007. In addition, D'Addana admitted that he himself has driven the truck and trailer numerous times since February 2007. These facts along with the fact that the Employer has continued to operate its business establishes that the Employer violated the Agreement.

Finally, the Union argues that with respect to November 27, December 2, December 9, 2006, the Employer did not notify the Union that the work being performed was at the owner's residence or agree to meet with the Union to discuss the matter. This demonstrates a lack of good faith by the Employer and its assertions should therefore not be credited. Neither Curry nor Beck knew what the truck had been used for, but were

reasonably relying on reports that the truck was seen on jobsites when the grievance was filed.

-SCR    Document 5-2    Filed 03/26/20

The Union requests that Beck be made whole for the loss of overtime pay for work performed on November 27, December 2, and December 9, 2006. In addition, it requests that the Employer be ordered to cease and desist from its failure to use the Union's referral service. Finally, the Union requests that Beck be made whole for lost wages and benefits as a result of his layoff.

**The Employer**

The Employer asserts that the Union has not presented sufficient or reliable evidence to establish that work was performed on November 27, December 2 or December 9, 2006 or on any other date after Beck's layoff that required the hiring of a Teamster under the Agreement. The Union did not present specific evidence concerning what work was performed or where the work was performed and therefore did not meet its burden of proof.

Further, the Employer argues that after the layoff of Beck, business declined and it did not have enough work for a Teamster. It claimed that there had not been full-time work for Beck for a while prior to February 2, 2007; nevertheless it was required to pay Beck for 40 hours per week regardless of the amount of work available. Moreover, the Employer argues that the Agreement is silent concerning the ability of an owner/operator to drive the truck and trailer. Because the Agreement does not expressly address the issue of owner/operators, the Employer asserts that it had the right to layoff Beck for lack of work and to continue to use the truck and trailer driven by the owner. Simply, the

Employer argues that under the circumstances, the Agreement does not require it to

employ a Teamster to drive the truck and trailer.

## DISCUSSION

A portion of the first and second stipulated issues arise from the Union's claim that the Employer used its truck to transport equipment or materials to or from jobsites without a Teamster driver on November 27, December 2 and December 9, 2006. Neither Curry nor Beck, who both testified, saw the All Rock truck on any jobsites on the dates in question. The Employer's regular business operates Monday through Friday. The evidence presented concerning these weekend incidents is hearsay, which standing alone is unreliable. As a result, the Arbitrator cannot sustain the Union's claim that the Employer violated the collective bargaining agreement by failing to utilize the Union's referral hall, pay contractual wages and benefits or by failing to recognize the Union as the collective bargaining agent for its employees and/or employ union members as required by the Agreement on November 25, 2006, December 2, 2006, and December 9, 2006. Accordingly, in this respect the grievance is denied.

The remainder of the first and second issues and the third issue concern whether Beck's layoff violated the Agreement. By the terms of the Agreement, the Employer recognized the Union as the exclusive bargaining representative of employees performing such tasks as driving 3-axle trucks and tractor trailers and performing yard work. Art. I, Sec. 1. In addition, the Agreement requires the Employer to use the referral services of

15

the Union to obtain employees to perform these defined or "covered" duties. Art. I, Sec. 5. Moreover, the Agreement prohibits the Employer from assigning "covered" work to another contractor (Article XXI) and further prohibits the Employer from allowing its employees to carry fuel tanks and fuel their own equipment, unless a Teamster is employed. (Article XXVI(f).) As a result, the Arbitrator rejects the Employer's assertion that it is not required to use the Union's referral service or employ a Union member because its owner is doing the driving. The Agreement makes no exception to the above-mentioned rules when an owner is driving the truck and trailer or when there is a decline in the employer's business. Rather, the unambiguous language states that "[e]quipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of the Agreement." Art. IX. Sec. 2. Further, the driver of a vehicle covered by the Agreement is required to be a Union member or become a Union member within a specified time, and is entitled to the all the wages and benefits specified in the Agreement for drivers. By using D'Addana to drive the truck and trailer, the Employer did not comply with any of these provisions of the Agreement.

There is no dispute that after Beck was laid off, the Employer continued its drilling and blasting operations. Curry, Beck and Ahlstedt testified that after February 2, 2007, they continued to see the Employer's truck and employees on jobsites throughout Westchester and Putnam counties. The Employer did not rebut this testimony. Instead, D'Addana admitted that he drove the truck numerous times and delivered equipment and

The Arbitrator does not find that the Union needed to prove each and every instance in which work covered by the Agreement was performed. It was undisputed that after Beck's layoff the Employer's operation continued to involve work that is covered by the Agreement. The Employer admitted that it continued to perform work that required the transportation of drills and therefore the use of its truck and trailer. In addition, Beck testified that he delivered a drill to a job shortly before his layoff, which would later require retrieval. Therefore, the Employer was obligated to employ a Teamster to perform that work and violated the Agreement when it failed to employ Beck or another driver referred by the Union to perform work covered by the Agreement.

In sum, since Jeffrey Beck's layoff, the Employer violated the Agreement by failing to utilize the Union's referral hall and pay contractual wages and benefits. Similarly, since Beck's layoff, the Employer failed to recognize the Union as the collective bargaining agent for its employees covered by the Agreement and failed to employ Union members as required by the Agreement. Finally, the Employer's failure to employ Jeffrey Beck or another driver referred by the Union after the date Beck was laid off violated the Agreement

With respect to the remedy for the above-described violations of the Agreement, the Employer made no claim that Beck was or is unfit for employment. Therefore, it shall make whole Beck for what he would have earned since his layoff had the Employer complied with the terms of the Agreement, less interim earnings. In addition, the Employer shall cease and desist from its failure to recognize the Union, to pay

## AWARD

The grievance is granted in part and denied in part. The Employer shall make

whole Beck for what he would have earned since his layoff had the Employer complied

with the terms of the Agreement, less interim earnings. In addition, the Employer shall

cease and desist from its failure to recognize the Union, to pay contractual wages and

benefits, to use the Union's referral service, and to employ Union members to perform

work covered by the Agreement.

Dated:  January 8, 2008
        Brooklyn, New York

_____
Arbitrator

I, Susan J. Panepento, do hereby affirm upon my oath as Arbitrator that I am the
individual described herein and who executed this instrument, which is my Opinion and
Award.

Dated:  January 8, 2008
        Brooklyn, New York

_____
Susan J. Panepento
Arbitrator