**ECF CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

LOCAL 456, INTERNATIONAL
BROTHERHOOD                                    **Index No. 08 Civ. 1894 (SCR)**
OF TEAMSTERS,

                    Plaintiff,


        —against—


ALL ROCK CRUSHING, INC.,

                Defendant.

------------------------------------------------------------------------x

## <u>DEFENDANT'S MEMORANDUM OF LAW IN</u><br><u>IN SUPPORT OF MOTION TO VACATE THE ARBITRATION AWARD</u>


Respectfully submitted,

<u>s/George Kokkalenios, Esq.</u>
George Kokkalenios, Esq. (GK 1044)
Law Offices of
George Kokkalenios & Associates
50 Main Street, Suite 1000
White Plains, New York 10606
(914) 682-6884

## <u>TABLE OF CONTENTS</u>

**<u>TABLE OF AUTHORITIES</u>**………………………………………………………...iii

**<u>PRELIMINARY AND JURISDICTIONAL STATEMENT</u>**…………………iv

**<u>ARGUMENT:  THE ARBITRATION AWARD SHOULD BE VACATED</u>**

I. **<u>The Arbitration Award is so imperfectly executed that a mutual, final and definite award was not made</u>** ……………………………………………….…….…..v

II. **<u>The Arbitrator exceeded the scope of her power</u>  …**…………………………vii

III. **<u>The Arbitration Award manifestly disregards the law</u>**……………………..viii

**<u>CONCLUSION</u>**………………………………………………………….......x

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Banco de Seguros del Estado v. Mut. Marine Office, Inc.</u>, 344 F.3d 255, 261 (2d Cir. 2003) ................................................................................................................................... vii

<u>ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.</u>, 102 F.3d 677, 686 (2d Cir. 1996) ..v

<u>DiRussa v. Dean Witter Reynolds Inc.</u>, 121 F.3d 818, 824 (2d Cir. 1997) ........................... vii

<u>Dodds v. Hakes</u>, 114 N.Y. 260, 260-63, 21 N.E. 398 (1889) ................................................. viii

<u>Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S</u>, 333 F.3d 383, 388 (2d Cir. 2003) ix

<u>Fischer v. CGA Computer Assocs., Inc.</u>, 612 F. Supp. 1038, 1041 (S.D.N.Y. 1985) ............. vi

<u>Fullman v. Ellis Plumbing and Engineering Co., Inc.</u>, 102 Misc. 62, 168 N.Y.S.2d 34, 36 (1st Dep't 1917) ........................................................................................................................... vii

<u>Goldman v. Architectural Iron. Co.</u>, 306 F.3d 1214, 1216 (2d Cir. 2002) ............................. ix

<u>Local 1199 v. Brooks Drug Co.</u>, 956 F.2d 22, 25 (2d Cir. 1992) ........................................... vii

<u>Local 63, Textile Workers Union of Am., C.I.O. v. Cheney Bros.</u>, 141 Conn. 606, 617, 109 A.2d 240 (1954) ...................................................................................................................... vi

<u>Matter of National Cash Register Co v. Wilson</u>, 8 N.Y.2d 377, 171 N.E.2d 302, 208 N.Y.S2d 951 (1960). ........................................................................................................................... viii

<u>New York Bus Tours, Inc. v. Theodore Kheel, et al.</u>, 864 F.2d 9( 2nd Cir. 1988) ................... vi

<u>Newspaper and Mail Deliverers' Union (Hudson County News Co.)</u>, 298 NLRM 564, 566 (1990). ................................................................................................................................. viii

<u>Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.</u>, 312 F.2d 299 (2nd Cir. 1963) ....................................................................................................................................... vi

<u>RiverbayCorporation v. Local 32-E</u>, 91 A.D. 2d 509, 510; 456 N.Y.S.2d 378, 279 (1st Dep't 1982) ..................................................................................................................................... viii

<u>Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.</u>, 157 F.3d 174, 176 (2d Cir. 1998) ....v

<u>Teamsters Local 213 (Bigge Drayage Co.)</u>, 198 NLRB 1046 (9172) enfd. 520 F.2d 172 (D.C. Cir. 1975) ............................................................................................................................... ix

<u>Westerbeke Corp. v. Daihatsu Motor Co., Ltd.</u>, 304 F.3d 200, 220 (2nd Cir. 2002) …………vii

<u>Statutes</u>

9 U.S.C. §10 .............................................................................................................................. iv

9 U.S.C. §10(a)(4) .................................................................................................................... iv

29 U.S.C § 185 ……………………………………………………..…………………………v

National Labor Relations Act §8(e) ………………………………………………….x, xi

National Labor Relations Act §8(b)(4)(ii)(B) ……………………………………………x, xi

N.Y. Civil Practice Law and Rules §7511 ................................................................................ iv

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

LOCAL 456, INTERNATIONAL BROTHERHOOD               **Index No. 08 Civ. 1894 (SCR)**
OF TEAMSTERS,

                                Plaintiff,

                                                              **MEMORANDUM OF LAW IN**
                                                         **SUPPORT OF DEFENDANT'S**
              —against—                          **MOTION TO VACATE THE**
                                                              **ARBITRATION AWARD**


ALL ROCK CRUSHING, INC.,

                                Defendant.
-----------------------------------------------------------------------x


<u>Background Information</u>

       Plaintiff, Local 456, International Brotherhood of Teamsters, ("Teamsters"),

commenced this action under Section 185 of the United States Code seeking confirmation of

an arbitration award issued by Susan Panepento arising out of a dispute between the

Teamsters and Defendant All Rock Crushing, Inc. ("All Rock")[*].  This action was brought

improperly, as Plaintiff seeks confirmation of an award that should be vacated under the

Federal Arbitration Act 9 U.S.C. §10 and New York's Civil Practice Law and Rules §7511.

       Defendant, through its counsel, respectfully submits this memorandum of law in

support of its motion to vacate the Arbitration Award with prejudice pursuant to the Federal

Arbitration Act, 9 U.S.C. §10(a)(4) and Civil Practice Law and Rules §7511 (a) (7) based on

the following:

(1) The Arbitration Award should be vacated because it is so imperfectly executed that a

     mutual, final and definite award was not made because the award does not contain a sum

     certain damages award;

---

[*] A copy of the Susan Panepento's arbitration award (hereinafter the "Arbitration Award") is annexed hereto as
Exhibit A.

(2)  The arbitrator exceeded the scope of her powers by creating a new agreement between

the parties that does not exist; and

(3)  The Arbitration Award manifestly disregards the law.

## PRELIMINARY AND JURISDICTIONAL STATEMENT

Defendant is a New York corporation operating a drilling and blasting company.  His

location is in the County of Westchester.  The nature of his business requires him to use a

truck to travel through the County of Westchester to reach project sites.  Defendant is a

signatory to a "me-too" collective bargaining agreement[†] with Plaintiff where none of the

terms were negotiated with Defendant nor was there an election to recognize the Plaintiff as

the authorized representative of a bargaining unit.

Jurisdiction is conferred upon this Court under 9 U.S.C. §10 and 29 U.S.C. § 185.

## ARGUMENT

### I.  The Arbitration Award is so imperfectly executed that a mutual, final and definite award was not made

The arbitration award does not contain a damages award nor does it include a method

for calculating the damages.  The Federal Arbitration Act, 9 U.S.C. §10 et seq., and its New

York equivalent, C.P.L.R. § 7511 (b)(iii) expressly provide that a Court may vacate an

arbitration award on the ground that a mutual, final, and definite award was not made.  The

Second Circuit has stated that "[a]n award is mutual, definite and final if it resolves all issues

submitted to arbitration, and determines each issue fully so that no further litigation is

necessary to finalize the obligations of the parties." ConnTech Dev. Co. v. Univ. of Conn.

Educ. Props., Inc., 102 F.3d 677, 686 (2d Cir. 1996) (quotation and citation omitted); *accord*

Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., 157 F.3d 174, 176 (2d Cir. 1998)

("[A]n arbitration award, to be final, must resolve all the issues submitted to arbitration, and .

---

[†] The collective bargaining agreement will expire on May 31, 2008 and Defendant has served a notice
terminating the contract upon Plaintiff.

. . it must resolve them definitively enough so that the rights and obligations of the two parties, with respect to the issues submitted, do not stand in need of further adjudication."); *see also* <u>Local 63, Textile Workers Union of Am., C.I.O. v. Cheney Bros.</u>, 141 Conn. 606, 617, 109 A.2d 240 (1954) ("[A]n award must be final as to the matters submitted so that the rights and obligations of the parties may be definitely fixed."). Here, Plaintiff seeks confirmation of an arbitration award on the issue of damages to grievant Jeffrey Beck. There can be no dispute that the award does not contain a sum certain damage award to Jeffrey Beck. It is also evident that the Arbitrator acknowledged that the question of remedies was before her. Yet, she failed to include a sum certain in her award. Although the Arbitration Award contains a general formula for assessing damages, that is simply insufficient. The very purpose of the arbitration proceeding was to decide the issues before the arbitrator and she simply failed to fulfill her obligation to decide on all issues presented, including remedies. If an arbitrator's award not only fails to state a sum certain, but also provides a formula that leaves disputes and is likely to require further proceedings, the courts vacate those portions of the award and remand. *See* <u>New York Bus Tours, Inc. v. Theodore Kheel, et al.</u>, 864 F.2d 9( 2nd Cir. 1988); *see also* <u>Fischer v. CGA Computer Assocs., Inc.</u>, 612 F. Supp. 1038, 1041 (S.D.N.Y. 1985)("construing ambiguous provisions of an arbitration award is the proper province of the arbitrator, not the courts") *and* <u>Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.,</u> 312 F.2d 299 (2nd Cir. 1963) ("Manner of computing damages was for arbitrator and not for courts").

It being undisputable that the Arbitrator's Award does not contain a specific damage award, it is respectfully submitted that this Court cannot confirm the Arbitration Award to the extent that a part of the relief sought in the within action relates to a damages to grievant Jeffrey Beck. Indeed, Plaintiff's own complaint does not contain a sum certain to be awarded to Jeffrey Beck and it remains a mystery what exact amount the Plaintiff believes it should be

vi

awarded.   Therefore, the Arbitration Award should be vacated on the ground that it is so imperfectly executed that a final and definite award upon the subject matter was not made.

## II. **The Arbitrator exceeded the scope of her power**

The arbitrator exceeded the scope of her power when she determined that the collective bargaining agreement does not contain an "owner-operator exception".  In fact, the collective bargaining agreement is *silent* on this issue.  The Federal Arbitration Act permits vacatur of an arbitral award where the arbitrators "exceeded their powers." 9 U.S.C. § 10(a)(4); Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003); see also Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 220 (2d Cir. 2002).  The Court's inquiry "focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." Westerbeke Corp.  (quoting DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 824 (2d Cir. 1997).  "We must determine 'whether the arbitrator[s] acted within the scope of [their] authority,' or whether the arbitral award is merely the "arbitrator[s'] own brand of justice." Banco citing Local 1199 v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir. 1992).  The New York Courts have similarly held that "the law is settled that the power of arbitrators is confined strictly to the matters submitted to them, and if they exceed that limit, their award will, in general, be void." Fullman v. Ellis Plumbing and Engineering Co., Inc., 102 Misc. 62, 168 N.Y.S.2d 34, 36 (1st Dep't 1917) *quoting* Dodds v. Hakes, 114 N.Y. 260, 260-63, 21 N.E. 398 (1889).  Thus, although the arbitrator was called upon to decide issues utilizing the collective bargaining agreement in front of her, she went beyond those limitations and created an entirely new category-- Employers, like Defendant, who executed a collective bargaining agreement such as the one at issue are not permitted to drive their own trucks.  In fact, there was testimonial evidence presented by the

UNION that there is a separate agreement for owner-operators.  Clearly, the Teamsters have signatories who are owner-operators and those individuals freely chose to become members. Even though the arbitrator was explicitly told that there is a separate agreement that governs an owner-operator scenario, she decided to construct an infraction that simply does not exist in the collective bargaining agreement that was before her.  New York Courts have found that where an arbitrator's construction of the contract is so irrational as to make a "new contract for the parties", vacatur is appropriate.  See Riverbay Corporation v. Local 32-E, 91 A.D. 2d 509, 510; 456 N.Y.S.2d 378, 279 (1st Dep't 1982) *quoting* Matter of National Cash Register Co v. Wilson, 8 N.Y.2d 377, 171 N.E.2d 302, 208 N.Y.S2d 951 (1960). Such action is clearly irrational and beyond the scope the arbitrator was summoned to perform. Accordingly, this Court should vacate the Arbitration Award on the ground that the arbitrator exceeded her authority by creating an infraction that does not exist.

### III.     **The Arbitration Award manifestly disregards the law**

In addition to the grounds afforded by statute, the Second Circuit permits vacatur of an arbitral award that exhibits a manifest disregard of law.  See e.g. Goldman v. Architectural Iron Co., 306 F3d 1214 (2nd Cir. 2002); see also Westerbeke Corp. *id,* above.  The National Labor Relations Act, governing labor and management relations, Section 8(e) prohibits a union and employer from entering into any agreement where the employer agrees to cease doing business with any other person and Section 8 (b)(4)(ii)(B) prohibits such conduct to force or require any person to cease doing business with any other person.  Although neither section prohibits conduct or agreement seeking to preserve or reacquire traditional bargaining unit work for bargaining unit employees – " fairly claimable work" -that matter turns on whether the work was ALREADY PERFORMED by the bargaining unit.  See Newspaper and Mail Deliverers' Union (Hudson County News Co.), 298 NLRM 564, 566 (1990).  Here,

the Arbitration Award issued a determination that the Defendant violated the collective

bargaining agreement because Defendant permitted other parties to haul stones from the site

of his yard.  Although there was no evidence presented by the Union that at any time did the

one-man"bargaining unit" ever perform such work for the Defendant, the arbitrator

irrationally decided that such action was a violation of the collective bargaining agreement.

Defendant is well within his rights under the National Labor Relations Act to allow others to

perform such work on his site, if he so chooses.  Simply because the Teamsters have decided

to include a description of that language in their collective bargaining agreement, the

National Labor Relations Act does not give a Union carte blanche jurisdiction over each and

every aspect of Defendant's business operation.  See Teamsters Local 213 (Bigge Drayage

Co.), 198 NLRB 1046 (9172) enfd. 520 F.2d 172 (D.C. Cir. 1975).  Defendant's choice to

allow others to haul stones, add fuel to trucks, and store leaves from and in his yard was not a

violation of the collective bargaining agreement because it was never work performed by the

"unit member".  In addition to the grounds afforded by statute, this Court may permit vacatur

of an arbitral award that exhibits a "manifest disregard of law." See Duferco Int'l Steel

Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003); see also, Goldman

v. Architectural Iron Co., 306 F.3d 1214, 1216 (2d Cir. 2002).  The arbitrator's resume

reveals an extensive background in labor law issues and is clearly familiar with the National

Labor Relations Act[‡].  She chose to disregard the fact that the bargaining unit member did

not perform this work, nor was there a claim for this work, and, in blatant disregard for the

statute, used it as a basis to find that the Defendant allegedly violated the collective

bargaining agreement.  Her error is so palpably evident that vacatur is warranted.

Accordingly, the Arbitration Award manifestly disregarded Sections 8(e) and 8 (b)(4)(ii)(B)

of the National Labor  Relations Act and should be vacated.

---

[‡] A copy of her resume, available on the internet, is annexed as Exhibit B.

## **CONCLUSION**

Based on the foregoing, this Court should vacate the Arbitration Award and award

Defendant reasonable attorneys' fees and the costs of defending this matter.

Dated:  April 11, 2008
White Plains, New York

Respectfully submitted,

s/George Kokkalenios, Esq.
George Kokkalenios, Esq. (GK 1044)
Law Offices of
George Kokkalenios & Associates
50 Main Street, Suite 1000
White Plains, New York 10606
(914) 682-6884

TO:    Steven Kern Esq.
Barnes, Iaccarino, Virginia,
Ambinder & Shepherd, PLLC
258 Saw Mill River Road
Elmsford, New York 10523
(914) 592-5740
Attorneys for Plaintiff

AMERICAN ARBITRATION ASSOCIATION

Case No. 13 300 02901 06

-------------------------------------------------------x

Arnold Rushing, Inc.

          Employer

   -and-                                  **OPINION AND**
                                                          **AWARD**

Local 456, International Brotherhood
of Teamsters,

          Union

Re: Failure to Utilized Referral Hall and Pay Contractual Wages

-------------------------------------------------------x

Before: Susan J. Panepento, Arbitrator

Appearances:

    For the Employer:
    George S. Kokkalenios, Esq.
    Law Offices of George S. Kokkalenios

    For the Union:
    Steven H. Kern, Esq,
    Barnes, Iaccarino, Virginia, Ambinder & Shepherd, LLC

      The above-named parties designated the undersigned Arbitrator to hear this

dispute. A hearing was held in this matter on August 3, 2007 and November 29, 2007.

Both parties were advised by the American Arbitration Association (AAA) by mail of the

first hearing date, but only the Union appeared and presented evidence. After that date,

the Arbitrator advised the Employer, by letter, that the hearing had proceeded in its

absence. Sometime thereafter the Employer contacted AAA and the Arbitrator and

requested an opportunity to present evidence in this matter. After conferring with the

parties, the Arbitrator scheduled a second day of hearing. On November 29, 2007, both

parties appeared before the Arbitrator. The Employer stipulated to certain facts, agreed

to accept Union counsel's oral summary of the evidence presented at the first day of the

hearing and waived its right to cross-examine the Union's witnesses, except for rebuttal.

In addition, the Employer was given the opportunity to present testimony and evidence.

As a result, both parties were afforded a full opportunity to present witnesses, submit

evidence, and present arguments in support of their respective positions. The record was

closed upon completion of the second day of hearing. The Arbitrator fully considered all

the evidence presented and the parties' arguments in preparation and issuance of this

Opinion and Award.

## ISSUES

The parties stipulated to the following issues:

Whether the Employer violated the collective bargaining agreement by failing to utilize the union's referral hall and pay contractual wages and benefits on November 25, 2006, December 2, 2006, and December 9, 2006 and since Jeffrey Beck was laid off?

Whether the Employer failed to recognize the Union as the collective bargaining agent for its employees and/or employ union members as required by the collective bargaining agreement on November 25, 2006, December 2, 2006, and December 9, 2006, and since Jeffrey Beck was laid off?

Whether the Employer laid off Jeffrey Beck in violation of the collective bargaining agreement?

If so, what shall be the remedy?

The Employer and Union are parties to the Heavy Construction Agreement ("Agreement"), effective from June 1, 2005 through May 31, 2008. The Employer agreed to be bound by the Agreement on January 15, 2005. Union Ex. 2. Relevant portions of the Agreement are set forth below:

## ARTICLE I – UNION RECOGNITION

1.   The Employer hereby recognizes the Union as the sole and exclusive collective bargaining agent for employees employed by the Employer in its present establishments or those thereafter opened by the Employer in Westchester or Putnam Counties for employees in the following classifications:
Chauffeurs on straight trucks, trailer tractors (all types), 3-axle trucks (physically load and unload), Euclids, . . . working Teamster foremen and employees in each and every classification represented by the Union.

2.   All employees covered by this Agreement, who are members of the Union, shall maintain membership in good standing in the Union as a condition of continued employment.

3.    All current and future employees covered by this Agreement, who are not members of the Union, shall become members of the Union in good standing on the ninetieth (90th) day from: (a) the date they first commenced work, (b) the date of execution of this Agreement or (c) the effective date of this Agreement, whichever is later.

\*    \*    \*

5.   The Employer shall notify the Union in the event the Employer needs additional help, and the Union shall refer applicants without discrimination as to their membership or non-membership in the Union, and the Employers shall have the right to determine which of said persons referred by the Union shall be employed. In due consideration to seniority with the Employer, the Employer's request for a particular person, the qualifications of the applicant to operate the equipment, the prior

experience of the applicant in the industry, the applicant's competence to perform the work and the duration of the applicant's period of unemployment.

7. The Employer agrees to contact the Union for workers either the day before or the morning of each day workers are needed, and referrals will be made according to the factors set forth above. If the Union is unable to supply workers, the Employer will be notified as soon as possible to avoid down time and to make other arrangements.

## ARTICLE IX – PAST BENEFITS

2. Work presently being performed by bargaining unit employees shall continue to be performed by bargaining unit employees in accordance with the provisions of this Agreement. Equipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of the Agreement.

## ARTICLE XXI – OUTSIDE CONTRACTS

1. The Employer shall not, during the term of this Agreement, contract or agree to contract or otherwise assign work performed by employees covered by this Agreement to any other firm, contractor, corporation, partnership, individual or otherwise, except as provided by Article VII hereof. It is agreed that employees covered by this Agreement shall continue to do all types of work heretofore performed by them. The Employer shall use employees covered hereby to transport cranes, cats or shovels.

## ARTICLE XXVI – WORKING CONDITIONS

2. (f) Restrictions: Employers may not carry fuel for equipment in fifty gallon drums or five gallon cans unless a driver is employed and the above requirements are adhered to.

\* \* \*

5. The starting and checking of all trucks and equipment covered hereby shall be performed by employees covered hereunder.

4

6. The Employer shall use equipment covered by this Agreement and operated by employees covered hereby for the purposes of delivering materials, parts, cones, planks or any equipment or material for construction and other equipment can be used should such purposes, in the judgment of the Union delegates.

In addition, the Agreement sets forth basic minimum wages and fringe benefit contributions (Welfare, Pension, Legal Services, etc.) that the Employer must pay to or on behalf of each covered employee for each hour worked. (Article II.)

## BACKGROUND

The following facts were stipulated: The Employer is a drilling and blasting contractor. Currently, its business mainly consists of drilling and blasting stone and rock for residential purposes. While employed by the Employer, Jeffrey Beck was a driver of a tri-axle dump truck and tag-a-long trailer. During the course of his employment, Beck transported equipment and materials, such as drills, excavators and pea gravel, to and from the Employer's yard to work sites. Beck was also the Union's shop steward for the Employer. On or about December 15, 2006, Beck filed a grievance asserting that the Employer had made deliveries on the three prior Saturdays without calling Beck or another Union driver to operate the truck. In either late January or early February 2007, Beck was laid-off by the Employer and has not been rehired since.[1]

---

[1] The Union asserted that the date of Beck's layoff was February 2, 2007. Initially, the Employer stated that it could not verify the date of layoff and asserted that it had been earlier than February 2007. Shop Steward reports, completed by Beck and submitted into evidence, indicate that Beck worked through January 27, 2007. In addition, the Employer's witness, Daniel Muro, testified that Beck was laid off in early February 2007. However, the parties agreed that determination of the date Beck last worked can be resolved when determining the remedy.

The Union presented testimony of three witnesses: Jeffrey Beck, Christopher Ahlstedt and business agent, Kevin Curry. Beck testified that he was employed full time by the Employer. Shop Steward reports he completed in 2006 were entered into evidence and show that he consistently worked 40 hours a week and often worked overtime.[2] Further, when he was not driving the truck, Beck supervised the laborers in the yard, fueled trucks and helped with truck maintenance. Union Business Agent Kevin Curry also testified that under the Agreement, unit members are responsible for more than just driving the trucks. The Agreement covers work such as yard work, fueling, and assisting with truck maintenance, etc.

Beck testified that in December 2006 he was advised by Curry to investigate and see if the Employer was using its truck on Saturdays without a Teamster driver. Shortly thereafter Beck asked Gabriel D'Addana, All Rock co-owner, if someone was using the truck on weekends. According to Beck, D'Addana said, "Maybe you don't understand, but it's my fucking truck. If I want to use it on weekends, I use it. You and your Union brothers can kiss my butt." Beck replied that D'Addana was supposed to call him in for overtime if they were working on weekends and told him that he had been told to look into the issue by Curry. D'Addana said that he was not going to pay time and a half.

A few days later, Beck was called to the office after work. Present were Daniel Muro, co-owner, Jeanette _____, the office manager, and Michelle _____, who works in the office. Muro said to Beck, "You cause me a lot of problems. If I get one more letter

---

[2] 2006 Shop Steward reports completed by Beck show that he worked between one and ten hours of overtime in at least 22 out of 38 reported work weeks.

from your hall about the Saturdays and the truck, you're fired. Get out." The Grievant replied that he was just doing what he was told to do. Muro responded, "Just get out."

Sometime in January, D'Addana told Beck that he had to accept cash for his overtime work. Beck replied that he couldn't take cash. D'Addana then said, "Well then, they'll be some changes here." According to Beck, when he went to the office to pick up his paycheck on February 2, 2007, he was met by Muro, who handed him two envelopes and said, "This is your pay and this is your last week." Beck replied, "What happened? There is work." Muro said, "I told you, I'm not dealing with you, I'm not dealing with the Teamsters. I have no work for you." Beck recalled that Muro also said something like – "you cost me a lot."

Beck testified that after February 2, 2007, there was still delivery work that needed to be done at a location in Rye/Harrison, New York where he had delivered a drill just prior to his layoff. In addition, Beck was told by other drivers that they had seen the All Rock truck on jobsites on weekends from December 2006 to February 2007. After February 2007, Beck observed D'Addana driving the All Rock truck or flat bed to various work sites. Specifically, on May 7, 2007, Beck saw D'Addana drop an excavator at a residence; on May 8, 2007, he saw D'Addana bring a trailer into the yard; on May 11, 2007, Beck saw D'Addana driving the 3-axle truck in Montrose, N.Y.; on May 22, 2007, he saw D'Addana driving a truck filled with dirt in Chappaqua, N.Y.; and late in May 2007 he saw D'Addana driving the truck in Harrison, N.Y. In addition, Beck observed All Rock employees working on a job site in Mahopac, N.Y. in late June 2007.

Beck testified that he has driven by the yard at least once a week since his layoff and each time he observed employees and materials in the All Rock yard.

Curry testified that he was informed by some unemployed Teamsters in December 2006 that All Rock was making weekend deliveries without a Teamster driver. As a result, he called Beck and asked him to ask Muro about it. Beck reported back to him that D'Addana told him it was none of his business. Curry instructed Beck to file grievances for three Saturdays. Subsequently, Curry spoke to Muro on the phone and Muro told him that he had no more work for Teamsters. Curry asked him if he was going out of business and Muro said, "No." Sometime thereafter, Curry tried to set up a meeting with Muro to discuss the issue further, and Muro refused and told him, "Screw you." These conversations occurred before Beck was laid off. After Beck was laid off, Curry, who regularly visits job sites in Westchester and Putnam counties, continued to see the Employer's drills and trucks at jobsites on a regular basis.

Christopher Ahlstedt, a former All Rock employee, testified that he is a driver for a fuel company and has been delivering fuel to construction sites in Westchester and Putnam counties since before February 2007. Therefore, he is on construction sites in Westchester and Putnam counties daily. After Beck was laid off, Ahlstedt testified that he frequently saw All Rock trucks and employees on construction sites performing blasting and drilling work. Ahlstedt stated that he saw D'Addana driving the All Rock truck on construction sites over 100 times since February 2007

Both Muro and D'Addana testified on behalf of the Employer. Muro testified that when he established All Rock Crushing in 1999, the business objective was to engage in

rock crushing and processing."[3] In 2002, Muro's partner left the business and Muro gave

50% of the shares of the Employer to his nephew, D'Addana, who became the company

president. Muro retained 50% of the shares and became vice-president. Thereafter, the

nature of the business changed to drilling and blasting and the crushing operation was

diminished. According to Muro, crushing is currently only a very small fraction of the

Employer's work. Muro stated that the Employer also does some minor material sales to

small contractors or landscapers. This work involves only storing and sorting stone. The

Employer no longer delivers or transports stone.

Muro testified that after 2002, D'Addana took over the "main management" of

the business and the amount of work that the business performed decreased due to

aggressive competition. As a result, the Employer suffered financial problems. Muro

stated that he could no longer afford to keep Beck due to these financial difficulties.

Around February 2, 2007, Muro told Beck that he was laid off and gave him his final pay.

Muro testified that since Beck's layoff, work has been "scarce." There have been

2-3 month periods when the Employer has had no blasting work. Further, the Employer

has not had any large jobs, only one medium job and a few small jobs involving mostly

drilling. In addition, he said that the Employer is "turning away from Union jobs,"

"downsizing and restructuring."

In sum, Muro stated that since February 2007, the work the Employer has

performed did not require employment of a Teamster. With only one or two work sites

in progress at a time, there was no need for a driver to move equipment between work

---

[3] Initially, Muro co-owned the company with Bruce Fiorino.

sites." Initially, Muro testified that since its inception, only 5% of the Employer's work

required use of the truck to transport equipment. Later in his testimony, he stated that

before 2001, the Employer had lots of work and the truck was used to move equipment 2

3 days a week, whereas now a drill is moved only once a week or less often. Also, Muro

stated that lately other contractors move his drills from site to site. Often these

contractors employ Teamster drivers who transport his drill between work sites. For

example, Joachim Construction moved All Rock's drill after Beck was laid off. Further,

Muro explained that the All Rock drillers and blasters keep tanks of fuel in their trucks

and refuel the drills/excavators on the work sites.

With respect to the three Saturdays in 2006, when the Union claims the Company

should have called Beck to drive the truck, Muro stated that Beck knew that D'Addana

was using the truck on those dates to do some work at his home. Further, Muro stated

that he had been unhappy about receiving Beck's grievance, and acknowledged telling

Beck that he didn't want to hear about it. When asked why he did not tell Curry what

the truck was being used for, Muro replied that Curry did not call him until after the fact

Muro also claimed that Curry had threatened him.

With respect to the parties' Agreement, Muro gave varying accounts of why he

signed the Agreement. Initially, he stated that he signed the Agreement after meeting

with the Union president at the Union office. At that time, the president told him that he

needed to have a Teamster driver, but he did not have to employ the driver full-time.

---

[4] Muro also stated that there are four other blasting contractors who operate
without a Teamster.

Sometime after signing the Agreement, Muro said he was told by the Union that he needed to employ a Teamster full-time, and had to pay him 40 hours per week.] Later in his testimony, Muro said that he was forced to sign the Agreement because Union representatives sat in his office and said that they would not leave until he signed the Agreement.

D'Addana testified that he is responsible for estimating jobs, laying out the work and moving equipment. On two of the Saturdays in issue, (he was not certain which ones), he used the All Rock truck to pick-up gravel and soil and deliver it to his house to complete his driveway. D'Addana stated that since Beck's layoff, he has driven the truck and trailer to deliver equipment including drills to job sites. He was not certain how many times he used the truck to deliver equipment, but stated it was more than once or twice and could have been, "30, 40 or 50 times."

## POSITIONS OF THE PARTIES

### The Union

The Union argues that the Employer has violated the parties' Agreement in several ways. First, in Article I, Section 1 of the Agreement, the Employer agreed to recognize the Union as the collective bargaining agent for its employees who drive tractor trailers and 3-axle trucks, yardmen, helpers, employees who drive pick-up trucks and fuel trucks ("covered employees.") By its failure to employ any employees who are members of the Union to perform these duties on November 27, December 2, and

December 9, 2006 and continuously since February 2, 2007, the Employer has violated

this provision of the Agreement. There is no dispute that the Employer has continued to

operate its business and that at a minimum its operation requires the use of a truck and

trailer to transport drills.

Second, the Union argues that the Employer has violated Article I, Sections 2 and

3 of the Agreement, by failing to employ employees who are or who become members of

the Union to perform work covered by the Agreement. Article I, Sections 2 and 3 require

employees who perform covered work to become and maintain membership in good

standing in the Union.

Third, Article I, Sections 5-7 require the Employer to utilize the Union's referral

system to obtain employees who operate equipment or perform services covered by the

Agreement. The Employer's failure to contact the Union to obtain a Teamster to drive

the truck and trailer on November 27, December 2, and December 9, 2006 and

continuously since February 2, 2007 violates these provisions.

The Union argues that the Employer has continued to operate its business and in

so doing has performed drilling and blasting work which required the use of an employee

covered by the Agreement. The Union notes that the Agreement covers both yardmen

and fuel truck drivers and the Employer did not state that there was none of this work

available. To the contrary, Muro testified that drillers and blasters carried 100 gallon

tanks of fuel in their trucks. Article XXVI, Section 2(f) of the Agreement expressly

prohibits the Employer from carrying fuel for equipment unless a driver is employed.

Further, Muro testified that the Employer still sorts stone for landscapers, work that is

performed by yardmen. Finally, the Union argues that the Employer cannot use other contractors to perform work that it covered under the Agreement. Muro testified that the Employer has used other contractors such as Joachim to transport the All Rock drill between job sites. Article XXI of the Agreement prohibits the Employer from assigning work performed by employees covered by the Agreement to any other firm, contractor or corporation.

In sum, the Union argues that it has established violations of the Agreement. It contends that to prove its case it does not have the burden to show each and every instance that the Employer performed covered work, but failed to employ a Teamster and/or utilize the Union's referral service. The nature of the Employer's drilling and blasting operation requires the movement of equipment and materials to and from worksites and the Employer's yard. It is illogical to conclude that the work could be completed otherwise. The Union provided some specific examples of work that the Employer performed since February 2007. In addition, D'Addana admitted that he himself has driven the truck and trailer numerous times since February 2007. These facts along with the fact that the Employer has continued to operate its business establishes that the Employer violated the Agreement.

Finally, the Union argues that with respect to November 27, December 2, December 9, 2006, the Employer did not notify the Union that the work being performed was at the owner's residence or agree to meet with the Union to discuss the matter. This demonstrates a lack of good faith by the Employer and its assertions should therefore not be credited. Neither Curry nor Beck knew what the truck had been used for, but were

13

reasonably relying on reports that the truck was seen on jobsites when the grievance was filed.

-SCR    Document 8-2    Filed 04/11/20

The Union requests that Beck be made whole for the loss of overtime pay for work performed on November 27, December 2, and December 9, 2006. In addition, it requests that the Employer be ordered to cease and desist from its failure to use the Union's referral service. Finally, the Union requests that Beck be made whole for lost wages and benefits as a result of his layoff.

**The Employer**

The Employer asserts that the Union has not presented sufficient or reliable evidence to establish that work was performed on November 27, December 2 or December 9, 2006 or on any other date after Beck's layoff that required the hiring of a Teamster under the Agreement. The Union did not present specific evidence concerning what work was performed or where the work was performed and therefore did not meet its burden of proof.

Further, the Employer argues that after the layoff of Beck, business declined and it did not have enough work for a Teamster. It claimed that there had not been full-time work for Beck for a while prior to February 2, 2007; nevertheless it was required to pay Beck for 40 hours per week regardless of the amount of work available. Moreover, the Employer argues that the Agreement is silent concerning the ability of an owner/operator to drive the truck and trailer. Because the Agreement does not expressly address the issue of owner/operators, the Employer asserts that it had the right to layoff Beck for lack of work and to continue to use the truck and trailer driven by the owner. Simply, the

Employer argues that under the circumstances, the Agreement does not require it to

employ a Teamster to drive the truck and trailer.

## DISCUSSION

A portion of the first and second stipulated issues arise from the Union's claim that the Employer used its truck to transport equipment or materials to or from jobsites without a Teamster driver on November 27, December 2 and December 9, 2006. Neither Curry nor Beck, who both testified, saw the All Rock truck on any jobsites on the dates in question. The Employer's regular business operates Monday through Friday. The evidence presented concerning these weekend incidents is hearsay, which standing alone is unreliable. As a result, the Arbitrator cannot sustain the Union's claim that the Employer violated the collective bargaining agreement by failing to utilize the Union's referral hall, pay contractual wages and benefits or by failing to recognize the Union as the collective bargaining agent for its employees and/or employ union members as required by the Agreement on November 25, 2006, December 2, 2006, and December 9, 2006. Accordingly, in this respect the grievance is denied.

The remainder of the first and second issues and the third issue concern whether Beck's layoff violated the Agreement. By the terms of the Agreement, the Employer recognized the Union as the exclusive bargaining representative of employees performing such tasks as driving 3-axle trucks and tractor trailers and performing yard work. Art. I, Sec. 1. In addition, the Agreement requires the Employer to use the referral services of

the Union to obtain employees to perform these defined or "covered" duties. Art. I, Sec. 5. Moreover, the Agreement prohibits the Employer from assigning "covered" work to another contractor (Article XXI) and further prohibits the Employer from allowing its employees to carry fuel tanks and fuel their own equipment, unless a Teamster is employed. (Article XXVI(f).) As a result, the Arbitrator rejects the Employer's assertion that it is not required to use the Union's referral service or employ a Union member because its owner is doing the driving. The Agreement makes no exception to the above-mentioned rules when an owner is driving the truck and trailer or when there is a decline in the employer's business. Rather, the unambiguous language states that "[e]quipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of the Agreement." Art. IX. Sec. 2. Further, the driver of a vehicle covered by the Agreement is required to be a Union member or become a Union member within a specified time, and is entitled to the all the wages and benefits specified in the Agreement for drivers. By using D'Addana to drive the truck and trailer, the Employer did not comply with any of these provisions of the Agreement.

There is no dispute that after Beck was laid off, the Employer continued its drilling and blasting operations. Curry, Beck and Ahlstedt testified that after February 2, 2007, they continued to see the Employer's truck and employees on jobsites throughout Westchester and Putnam counties. The Employer did not rebut this testimony. Instead, D'Addana admitted that he drove the truck numerous times and delivered equipment and

The Arbitrator does not find that the Union needed to prove each and every instance in which work covered by the Agreement was performed. It was undisputed that after Beck's layoff the Employer's operation continued to involve work that is covered by the Agreement. The Employer admitted that it continued to perform work that required the transportation of drills and therefore the use of its truck and trailer. In addition, Beck testified that he delivered a drill to a job shortly before his layoff, which would later require retrieval. Therefore, the Employer was obligated to employ a Teamster to perform that work and violated the Agreement when it failed to employ Beck or another driver referred by the Union to perform work covered by the Agreement.

In sum, since Jeffrey Beck's layoff, the Employer violated the Agreement by failing to utilize the Union's referral hall and pay contractual wages and benefits. Similarly, since Beck's layoff, the Employer failed to recognize the Union as the collective bargaining agent for its employees covered by the Agreement and failed to employ Union members as required by the Agreement. Finally, the Employer's failure to employ Jeffrey Beck or another driver referred by the Union after the date Beck was laid off violated the Agreement

With respect to the remedy for the above-described violations of the Agreement, the Employer made no claim that Beck was or is unfit for employment. Therefore, it shall make whole Beck for what he would have earned since his layoff had the Employer complied with the terms of the Agreement, less interim earnings. In addition, the Employer shall cease and desist from its failure to recognize the Union, to pay

## AWARD

The grievance is granted in part and denied in part. The Employer shall make

whole Beck for what he would have earned since his layoff had the Employer complied

with the terms of the Agreement, less interim earnings. In addition, the Employer shall

cease and desist from its failure to recognize the Union, to pay contractual wages and

benefits, to use the Union's referral service, and to employ Union members to perform

work covered by the Agreement.

Dated:   January 8, 2008
         Brooklyn, New York

_____
Arbitrator

I, Susan J. Panepento, do hereby affirm upon my oath as Arbitrator that I am the
individual described herein and who executed this instrument, which is my Opinion and
Award.

Dated:   January 8, 2008
         Brooklyn, New York

_____
Susan J. Panepento
Arbitrator



Back

STATE OF NEW JERSEY
PUBLIC EMPLOYMENT RELATIONS COMMISSION

# RESUME OF PANEL ARBITRATOR

## Susan J. Panepento

Arbitrator; Deputy Chair for Dispute Resolution, NYCOCB

### GRIEVANCE ARBITRATION EXPERIENCE:

Principal mediator of labor disputes between NYC and its unions; hear and decide expedited arbitrations. Private Sector: Arbitration experience in education, health care, manufacturing, trucking and storage and service industries.

### MEDIATION AND FACT-FINDING EXPERIENCE:

See above

### INTEREST ARBITRATION EXPERIENCE:

### EDUCATION:

Brooklyn Law School, J.D. 1992
Cornell University, School of Industrial and Labor Relations, B.S. 1985

### PROFESSIONAL AFFILIATIONS:

New York State Bar Association

### OTHER RELEVANT OR EQUIVALENT EXPERIENCE:

Panel Memberships: Port Authority Employment Relations Panel, NYS Employment Relations Board, NJ State Board of Mediation, Waterfront Commission of NY, NJ PERC; NYSBA Labor Arbitration Mentoring Program. Completed National Academy of Arbitrators Arbitrator Development Program.

### PER DIEM FEES:
**GRIEVANCE**          1,200
**ARBITRATION $**
**CANCELLATION NOTICE AND FEE (if any):** Full per diem charged if notice of cancellation received fewer