UNITED STATES DISTRICT COURT                    *ECF  CASE*
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
LOCAL 456, INTERNATIONAL BROTHERHOOD          :
OF TEAMSTERS,                                  :      Case No. 08–Civ.–1894(SCR)
                                               :
                    Plaintiff,                 :      **DECLARATION OF**
                                               :      **STEVEN H. KERN**
           —against—                           :      **IN OPPOSITION TO**
                                               :      **DEFENDANT'S MOTION**
ALL ROCK CRUSHING, INC.,                       :      **TO VACATE**
                                               :      **ARBITRATION AWARD**
                    Defendant.                 :
------------------------------------------------------------------------x

        STEVEN H. KERN declares the following pursuant to 28 U.S.C. § 1746:

        1.      I am the attorney for plaintiff Local 456, International Brotherhood of Teamsters

("the Union") and am fully familiar with the facts herein set forth. I make this Declaration in

opposition to defendant's motion to vacate the arbitration award herein, and in support of

confirmation and enforcement of the award.

        2.      The Union is a labor organization representing employees in an industry affecting

commerce within the meaning of the Labor Management Relations Act ("LMRA") §§ 2, 301; 29

U.S.C. §§ 152, 185. Its principal office is located at 160 South Central Avenue, Elmsford, New

York, County of Westchester.

        3.      The defendant All Rock Crushing, Inc. ("All Rock") is upon information and

belief a corporation duly organized and existing under the laws of New York State with its

principal office and place of business located at 465 Yorktown Road, Croton-on-Hudson, New

York, County of Westchester. See printout that Declarant obtained from the website of the New

York State Department of State, Division of Corporations, copy annexed as Exhibit A.

        4.      The Union and All Rock are parties to a certain collective bargaining agreement

("CBA") for the period June 1, 2005 through May 31, 2008 covering certain of its employees. A

true copy of same together with a signature page executed by All Rock is annexed hereto as Exhibit B.

5.    Pursuant to Article XXXI of the CBA, grievances or disputes involving any controversy, dispute or misunderstanding as to the meaning, application or observance of any provision of the CBA  may be submitted to arbitration, and the arbitrator's decision shall be final and binding.

6.    A dispute arose concerning the failure and refusal to utilize the referral hall and pay the contractual wages and benefits (the "Grievance").

7.    The Union submitted the Grievance to the American Arbitration Association by serving a Notice of Intention to Arbitrate dated December 19, 2006 and by letter to the American Arbitration Association dated December 20, 2006. True copies thereof are annexed hereto as Exhibit C.

8.    A hearing was duly held by Arbitrator Susan J. Panepento on August 3 and November 29, 2007 at the offices of the said American Arbitration Association on the above issues and on the issue of the layoff of Jeffrey Beck.

9.    The Award of Arbitrator Panepento was issued on January 8, 2008 and delivered to counsel for All Rock and the Union on or about January 15, 2008. A true copy thereof is annexed hereto as Exhibit D.  A true copy of an unsigned blank form entitled "Amendment to the Teamsters Local 456 Heavy Construction Agreement – Owner Operator" which was admitted as evidence in the hearing as Union Exhibit 8 is annexed hereto as Exhibit E.  Union business agent Kevin Curry testified that this form is executed as an addendum to the CBA for employers who do their own driving, but that this addendum was not executed regarding All Rock.

10.     The Arbitrator found that All Rock "violated the Agreement (the CBA) when it failed to employ Beck or another driver referred by the Union to perform work covered by the Agreement." [Exhibit D, page 18]  The said Award provided that the Employer (All Rock) shall make whole Beck for what he would have earned since his layoff had the Employer complied with the terms of the Agreement (CBA), and further, that All Rock shall cease and desist from its failure to recognize the Union, to pay contractual wages and benefits, to use the Union's referral service, and to employ Union members to perform work covered by the CBA.

11.     All Rock has failed and refused to comply with the Award.

12.     All Rock has to date not offered to reinstate Beck to his employment, nor has it made him whole for his losses less interim earnings, as awarded.

13.     Beck's lost wages, and the offset for his interim earnings, can be easily calculated.

14.     As set forth in detail in the affidavit of Jeff Beck, sworn on June 27, 2008, Beck's lost wages through May 31, 2008, offset by his interim earnings during that period, amount to $24,356.00, based on a 40-hour week.

15.     As set forth in detail in the Beck affidavit, projecting overtime in the amount worked in 2006 into the same period, Beck's lost wages through May 31, 2008, offset by his interim earnings during that period, amount to $42,732.00, including overtime.

16.     Jeff Beck and the Union have been further damaged by All Rock's failure to pay benefits contributions on behalf of Beck based on those hours. As set forth in detail in the affidavit of Andrew Mackle, sworn on July 25, 2008, those lost benefits contributions, based on 40-hour weeks, offset by benefits contributions paid by Beck's employers on his behalf, amount to $16,683.15.

17.     No figure is submitted for lost benefits contributions including projected overtime, because most of the benefits formulas are based on weekly hours up to a maximum of 40 hours.

WHEREFORE, I respectfully request that this Court confirm and enforce the Arbitration Award issued by Arbitrator Panepento; grant judgment for Beck's back pay and benefits as provided by the said Award; enjoin All Rock to comply with each and every provision of the said Award; award plaintiff Union reasonable attorney fees and the costs and disbursements of this action; and grant plaintiff such other, further or different relief as the Court may deem just, proper or equitable

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on _____ July 25, 2008.     _____ s/ Steven H. Kern _____
                                                            STEVEN H. KERN, ESQ. (SK-8600)

F:\LEGAL\456\All Rock Crushing\Court\Sum jgt\Decl Kern.doc

4

# NYS Department of State

## Division of Corporations

## Entity Information

Selected Entity Name: ALL ROCK CRUSHING INC.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | ALL ROCK CRUSHING INC. |
| **Initial DOS Filing Date:** | SEPTEMBER 24, 1999 |
| **County:** | WESTCHESTER |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

ALL ROCK CRUSHING INC.
465 YORKTOWN ROAD
CROTON ON HUDSON, NEW YORK, 10520

**Chairman or Chief Executive Officer**

DANIEL MUROO
465 YORKTOWN ROAD
CROTON ON HUDSON, NEW YORK, 10520

**Principal Executive Office**

ALL ROCK CRUSHING INC.
465 YORKTOWN ROAD
CROTON ON HUDSON, NEW YORK, 10520

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results     New Search

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page

# TEAMSTERS UNION LOCAL No. 456

**Affiliated with**
**International Brotherhood of Teamsters**

EDWARD DOYLE, JR.
President

Phones: (914) 592-9500/1/2
(914) 769-5577
Fax: (914) 592-4266



ROBERT A. ROBERGE
Secretary - Treasurer

**Affiliated With**
*New York State Building and
Construction Trades Council
Westchester-Putnam Building Trades Council*

160 So. Central Avenue • Elmsford, New York 10523

## HEAVY CONSTRUCTION AGREEMENT
(Independent Employer)

The undersigned Employer hereby agrees to be bound by all of the terms and conditions set forth in the Heavy Construction Agreement presently in effect between Teamsters Local 456, affiliated with the International Brotherhood of Teamsters, and the Construction Industry Council of Westchester and The Hudson Valley, Inc. and the Building Contractors Association of Westchester and Mid-Hudson Region, Inc. as the same may be amended, modified or extended from time to time.

FOR THE INDEPENDENT EMPLOYER:

_All Rock Crushing, Inc_
(Name of Employer)

_465 Yorktown Road, Croton on Hudson N.Y. 10520_
(Address of Employer)

BY: _Daniel Muro  Dan Muro_     Date: _1/15/05_
(President)

Telephone Number: _(914) 827-3274_

Fax Number: _(914) 271-8393_

Federal ID#: _13-4094575_

FOR THE UNION:
Teamsters Local 456 a/w International Brotherhood of Teamsters

By: _____     Date: _7/31/05_
(Business Manager)

*Serving*
*Westchester, Putnam and Dutchess Counties*
*New York*



Honorary Presidents
John Acropolis
Edward Doyle



# HEAVY CONSTRUCTION AGREEMENT

### between

## TEAMSTERS LOCAL 456

### affiliated with the

### International Brotherhood of Teamsters
### 160 South Central Avenue
### Elmsford, New York
### (914) 592-9500

### and

## CONSTRUCTION INDUSTRY COUNCIL OF WESTCHESTER AND THE HUDSON VALLEY, INC.

### and

## BUILDING CONTRACTORS ASSOCIATION OF WESTCHESTER AND MID-HUDSON REGION

### For the period
### June 1st, 2005 to May 31st, 2008

®⬤54

# INDEX

| Article | | Page |
|---|---|---|
| I | Union Recognition .............. | 1 |
| II | Wages ......................... | 4 |
| III | Hours of Work and Overtime ....... | 7 |
| IV | Sundays and Holidays ........... | 10 |
| V | Vacations ..................... | 12 |
| VI | Layoff and Reinstatement ......... | 13 |
| VII | Extra Equipment and Sub-Contracting | 14 |
| VIII | Individual Contracts .............. | 14 |
| IX | Past Benefits ................... | 15 |
| X | Welfare Fund ................... | 15 |
| XI | Pension Fund ................... | 16 |
| XII | Annuity Fund ................... | 16 |
| XIII | Supplemental Unemployment Benefit Fund | 17 |
| XIV | Education and Training Fund ...... | 18 |
| XV | Legal Services Fund ............. | 18 |
| XVI | New York State Disability Benefits .. | 19 |
| XVII | Collection of Employer Contributions | |
| | To The Benefit Funds ............ | 19 |
| XVIII | Double Breasted ................. | 22 |
| XIX | Employee's Expense ............. | 23 |
| XX | Pay and Records - 401(k) Savings Plan | 23 |
| XXI | Outside Contracts .............. | 24 |
| XXII | Discharge ..................... | 24 |
| XXIII | No Strike -- No Lockout .......... | 24 |
| XXIV | Picket Line .................... | 24 |
| XXV | Leave of Absence For Death In Family | 24 |
| XXVI | Working Conditions ............. | 25 |
| XXVII | Working Teamster Foreman ....... | 29 |
| XXVIII | Job Conference ................. | 31 |
| XXIX | Non-Discrimination Clause ........ | 32 |
| XXX | Drug Free Workplace Program ..... | 32 |
| XXXI | Grievance Procedure ............. | 33 |
| XXXII | Industry Advancement Fund ....... | 35 |
| XXXIII | Most Favored Nations Clause ...... | 36 |
| XXXIV | Worker's Compensation -- ADR Program | 36 |
| XXXV | Savings Clause .................. | 37 |
| XXXVI | Duration of Agreement ........... | 37 |

i

AGREEMENT, made as of the 1st day of June, 2005 by and between TEAMSTERS LOCAL 456, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS (hereinafter referred to as the "UNION"), and the CONSTRUCTION INDUSTRY COUNCIL OF WEST-CHESTER AND HUDSON VALLEY, INC., THE BUILDING CONTRACTORS ASSOCIATION OF WESTCHESTER AND THE MID-HUDSON REGION, INC., AND INDEPENDENT EMPLOYERS (hereinafter collectively referred to as the "EMPLOYER", "CONTRACTOR" or the "ASSOCIATION".)

## WITNESSETH:

## THE PARTIES HERETO AGREE AS FOLLOWS:

## ARTICLE I — UNION RECOGNITION

1. The Employer hereby recognizes the Union as the sole and exclusive collective bargaining agent for employees employed by the Employer in its present establishments or those thereafter opened by the Employer in Westchester or Putnam Counties for employees in the following classifications:

Chauffeurs on straight trucks, trailer tractors (all types), 3-axle trucks (physically load and unload), Euclids, A&T Trailer Wagons, mixer men, (asphalt plants and cement hopper men, including employees who weigh ingredients), yardmen and helpers, asphalt and concrete plants (both portable and stationary), high pressure boiler operators in asphalt and batch plants (either portable or stationery), pick-up trucks, dynamite trucks, agitator trucks, central mixing plants (manual or automated), weighmasters, maintenance personnel of asphalt and concrete plants (portable or stationary) operators of block plants, roller trucks, A-frame truck operated from inside the cab, winch trucks operated from inside the cab, fuel trucks, operators of stone crushers and maintenance of such equipment, operators of seeding and mulching trucks, water trucks, lift trucks in garages, yards and job sites, belly dumpers, tire trucks, welding trucks on pipelines, drivers of posthole diggers, mortar mixing trucks, suburbans

1

(when carrying materials and/or power tools to, from and on the job site), operators of oil distributor trucks, operators of towing and towed equipment, operators of scrapers and turnpulls, which are loaded by shovel or bucket, operators of vehicles moving cranes shovels, cats, etc., snow-plows (whether jeep, suburban, pick-up or other type of vehicle), maintenance personnel in all batch plants, asphalt plants and crushers, working Teamster foreman and employees in each and every classification represented by the Union.

2.   All employees covered by this Agreement, who are members of the Union, shall maintain membership in good standing in the Union as a condition of continued employment.

3.   All current and future employees covered by this Agreement, who are not members of the Union, shall become members of the Union in good standing on the ninetieth (90th) day from: (a) the date they first commenced work, (b) the date of execution of this Agreement or (c) the effective date of this Agreement, whichever is later. For the purpose of this Article, an employee shall be considered a member of the Union in good standing if he/she tenders the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

4(a).  The Employer shall deduct from the wages of employees covered hereby, who sign dues deduction authorization forms, the sum of eighty cents ($ .80) per hour for each hour paid to each employee covered hereunder including Shapetime, Overtime, Holiday and Vacation Pay and remit the same weekly to the Union with a list of employees, the number of hours worked by each and the name of any employee who shall fail to sign such an authorization. Such authorization shall be signed in duplicate with one copy supplied to the Union, and they shall be irrevocable for a period of one year or the termination of the Collective Bargaining Agreement, whichever is sooner, and shall be automatically renewed from year to year unless sixty (60) days prior to any anniversary date such authorization shall be terminated by written notice to the Employer and to the Union.

(b)   The Employer shall deduct from the wages of employees covered hereby, who sign a Teamsters Local 456 Voluntary Political Action Payroll Deduction

2

Authorization Form, the sum of five cents ($ .05) for each hour paid to each employee but not to exceed forty (40) hours per week. Such authorization shall be signed in duplicate and may be revoked by the employee in writing to the Union and the Employer.

5.   The Employer shall notify the Union in the event the Employer needs additional help, and the Union shall refer applicants without discrimination as to their membership or non-membership in the Union, and the Employer shall have the right to determine which of said persons referred by the Union shall be employed. In making such referral and selection, the parties shall give due consideration to seniority with the Employer, the Employer's request for a particular person, the qualifications of the applicant to operate the equipment, the prior experience of the applicant in the industry, the applicant's competence to perform the work and the duration of the applicant's period of unemployment.

6.   The Union agrees to carefully evaluate all drivers "fit for duty status" before sending a driver to the Employer.

7.   The Employer agrees to contact the Union for workers either the day before or the morning of each day workers are needed, and referrals will be made according to the factors set forth above. If the Union is unable to supply workers, the Employer will be notified as soon as possible to avoid down time and to make other arrangements.

8.   The Union and the Employer bargaining committees will meet as required to evaluate various practices, including operation of the referral hall and matters related to out of area material and supply deliveries to jobsites.

3

## ARTICLE II—WAGES

1.  The following basic minimum scale of wages shall be paid by the Employer:

| CLASSIFICATIONS: | 7/01/06 - 6/30/07 | | |
|---|---|---|---|
| | Per Hour | Time and 1/2 | Pro-Rata Vacation |
| **Drivers:** | | | |
| Straight Jobs ..................... | $32.58 | $48.87 | $14.48 |
| 6-Wheelers ..................... | 32.58 | 48.87 | 14.48 |
| 10-Wheelers .................. | 32.58 | 48.87 | 14.48 |
| A-Frame Truck (inside cab) ...... | 32.58 | 48.87 | 14.48 |
| Winch Truck (inside cab) ......... | 32.58 | 48.87 | 14.48 |
| Dynamite Trucks ................ | 32.58 | 48.87 | 14.48 |
| Seeding Trucks ................. | 32.58 | 48.87 | 14.48 |
| Mulching Trucks ............... | 32.58 | 48.87 | 14.48 |
| Agitator Trucks ................ | 32.58 | 48.87 | 14.48 |
| Water Trucks .................. | 32.58 | 48.87 | 14.48 |
| Cement Trucks (all types) ........ | 32.58 | 48.87 | 14.48 |
| Suburban, Station Wagons, Cars, Pick-Ups ............... | 32.58 | 48.87 | 14.48 |
| Any vehicle carrying materials of any kind Tractor & Trailers | | | |
| All Types ..................... | 33.20 | 49.80 | 14.76 |
| Low Boy* ..................... | 34.83 | 52.25 | 15.48 |
| 14-Wheeler ................... | 32.70 | 49.05 | 14.53 |
| Fuel Trucks ................... | 33.03 | 49.55 | 14.68 |
| Tire Trucks ................... | 33.03 | 49.55 | 14.68 |
| Off-Road Equipment (Over 40 Tons) | | | |
| Euclid** ...................... | 34.08 | 51.12 | 15.15 |
| Athey Wagons ................. | 33.58 | 50.37 | 14.92 |
| D.J.B.** ...................... | 34.08 | 51.12 | 15.15 |
| Belly Dumps ................... | 33.58 | 50.37 | 14.92 |
| Articulated Dumps ............. | 33.58 | 50.37 | 14.92 |
| Trailer Wagons ................ | 33.58 | 50.37 | 14.92 |
| Off-Road Equipment (Under 40 Tons) | | | |
| Euclid** ...................... | 33.45 | 50.18 | 14.87 |
| Athey Wagons ................. | 33.33 | 50.00 | 14.81 |
| D.J.B.** ...................... | 33.83 | 50.75 | 15.04 |
| Belly Dumps ................... | 33.33 | 50.00 | 14.81 |
| Articulated Dumps ............. | 33.33 | 50.00 | 14.81 |
| Trailer Wagons ................ | 33.33 | 50.00 | 14.81 |
| Darts ......................... | 34.08 | 51.12 | 15.15 |
| RXS ........................... | 34.45 | 51.68 | 15.31 |

*   *Low Boy Drivers that load/unload equipment will receive an additional $1.00 per hour effective 7/01/05.*
*   *DJB and Euclid Drivers will receive an additional $ .50 per hour effective 7/01/05.*

4

Plant:

| | | | |
|---|---|---|---|
| Hopper Person | 32.58 | 48.87 | 14.48 |
| Crusher Operator | 32.58 | 48.87 | 14.48 |
| Lift Truck (in garage, yard or jobsite) | 32.58 | 48.87 | 14.48 |
| Mixer person (asphalt plant & cement hopper operations, one who weighs ingredients and in manual or automatic control mixing plants) | 32.58 | 48.87 | 14.48 |
| High Pressure Operator (in asphalt & batch plants) | 32.70 | 49.05 | 14.53 |
| Weighmaster | 33.83 | 50.75 | 15.04 |
| Welders | 32.78 | 49.17 | 14.57 |
| Maintenance Person | 32.78 | 49.17 | 14.57 |
| Mechanic | 32.78 | 49.17 | 14.57 |
| Mechanics Helper | 32.45 | 48.68 | 14.42 |
| Stock Room Person | 32.45 | 48.68 | 14.42 |
| Working Foreman in Garage | 33.23 | 49.85 | 14.77 |
| Yardperson & Helpers | 32.33 | 48.50 | 14.37 |

## FRINGE BENEFIT CONTRIBUTIONS
### (Wage and Benefit Increase to Run
### From July 1 to June 30 each Year)

7/01/06 - 6/30/07
Per Hour

### Contributions for each hour worked limited
### to forty (40) hours per week

| | |
|---|---|
| Welfare Fund** | $5.50 |
| Pension Fund | 5.35 |
| Legal Services Fund* | .20 |
| Education and Training Fund | .05 |
| Annuity Fund | 5.00 |

* Added to wages, taxed and remitted to Legal Services Fund.
** 5¢ per hour to be segregated into a special account for Haz-Mat testing, etc.

### Contributions for each hour worked

| | |
|---|---|
| Supplemental Unemployment Benefit Fund | .25 |
| Industry Advancement Fund | .30 |

### Deducted from wages for each hour worked,
### limited to forty (40) hours per week

| | |
|---|---|
| Political Action Fund | —.05 |

5

**Deducted From Wages for each hour worked**
Administrative Dues  ....................    —.80

**Additional Wage and Benefit Fund Increases to
be allocated by the Union among Wages, Welfare,
Pension, Annuity, Legal, Education and SUB Funds.**

Per Hour

7/01/07 - 6/30/08  ..................    $1.85

On each July 1st of the contract, upon the recommendation of the Trustees of the Welfare, Pension, SUB, Annuity, Training and Legal Services Funds, the Union and the Association may agree to reallocate the amount set forth above to be contributed to the Welfare, Pension, SUB, Annuity, Training and Legal Services Funds respectively; however, in no event shall the total benefit fund amount to be contributed exceed the total benefit fund amount agreed to between the Union and the Employer.

Benefit Fund Contributions, Industry Advancement Fund, Political Action Fund and Administrative Dues contributions and/or Deductions are subject to the provisions of Articles: I (4a & b), X, XI, XII, XIII, XIV, XV, XVII and XXXII.

2.    The Union shall have the right to appoint, replace or remove a Teamster shop steward in each yard who shall be paid at a rate equal to the highest rate of any employee in such yard working under the provisions of this contract.

3.    In event a lower paid employee is assigned to a position in a higher scale, such employee shall be paid at the higher rate for a full day in which he performed such work, irrespective of the number of hours he actually worked. In no event shall an employee receive less than the wage provided for in his classification.

4.    **Shift Premium:**
Employees who work a second, third, or an irregular shift shall receive fifteen (15%) percent above the wage rate.

5.    Employees working the night shift Friday night into Saturday shall be paid at the rate of 1.5X the hourly rate plus shift differential for hours worked after 12:00 a.m. (Midnight).

Employees working the night shift Saturday night into Sunday shall be paid at the rate of 2X the hourly rate plus shift differential for hours worked after 12:00 a.m. (Midnight). Employees working the night shift Sunday night into Monday morning shall be paid 2X the hourly rate plus shift differential until 12:00 a.m. (Midnight).

6.    The Union agrees to provide each Employer working a night shift with the name and telephone number of the Union Business Agent to contact until 10 p.m.

7.    The shift premium will be paid on public works contracts for off-shift or irregular shift work when mandated by the NYS DOT or other Governmental Agency contracts. The shift premium will be paid on all other projects.

8.    If an employee is laid off, he shall be paid wages and other benefits in full, not later than the first pay period following the layoff.

9.    Whenever an employee covered hereby shall be assigned to the same work operation with an employee represented by the Engineer's Union at the same job or plant site, he shall receive the same rate of pay for such work as the employee represented by the Engineer's Union receives, or the rate provided herein, whichever is greater.

### ARTICLE III — HOURS OF WORK AND OVERTIME

1(a).    The normal work week of all employees shall consist of forty (40) hours, eight (8) hours per day, five (5) days per week, Monday to Friday.

(b)    The work day shall start at 7:00, 7:30, 8:00 a.m. or, if required by job specification or bid documents, 9:00 a.m. The Employer shall post the starting time not later than 4:15 p.m. on Friday of the preceding week. An employee's starting time shall be uniform throughout the week, except under specific circumstances which shall be mutually agreed. An employee who is not assigned to work after reporting to the job shall be paid two (2) hours' pay, and, if requested to wait for the Employer, shall wait for two (2) hours computed from the time he was instructed to report. The day for which an employee receives reporting pay shall be counted to determine vacation credits.

7

(c) Any employee who shall start work later than the posted starting time through no fault of his own shall have his time computed from the posted starting time.

(d) On the first day an employee is scheduled to work for an Employer for the first time he shall report to the job site at least 15 minutes before the scheduled starting time to fill out a W-4 and any other necessary employment forms.

2. A lunch period of thirty (30) minutes shall be granted to the employees between the hours of 11:30 a.m. and 1:00 p.m.

3. Employees assigned to work on any day shall receive not less than eight (8) hours pay.

4. Employees shall be paid at the rate of one and one-half (1 1/2) times the straight-time hourly rate of pay for all work performed for the following:

(a) work before the scheduled starting time or after the scheduled finishing time.

(b) work in excess of eight (8) hours per day or forty (40) hours per week.

(c) work performed on Saturdays.

5. In the event an employee is assigned to work before the scheduled starting time, he shall nevertheless be afforded work or paid for not less than eight (8) hours, computed from the scheduled starting time hereinabove specified.

6. Employees in the Classification of mechanic, plant man and yardman, having at least ninety (90) days of employment, shall be guaranteed forty (40) hours of work each week. This guarantee shall not apply for the first week of the season, after layoff, nor for emergency conditions such as snow-removal, or to receive deliveries during the off-season. Yardmen covered by this guarantee shall be required to perform non-mechanic duties in the garage, if required to by the Employer.

7. Where the job specifications provide for flexible starting times and night shifts between 5:00 p.m. and 12 Midnight with the approval of the Union, the Employer may work an irregular shift outside of the regular hours set forth

8

in this Article. Employees shall be entitled to an irregular shift differential on the basis of 15% per hour for all work performed during the irregular shift. All other provisions of this Article shall apply to irregular shift work.

8. It is understood and agreed that because of certain statutes, laws, ordinances, regulations and contractual requirements of various government sectors requiring the Employer to perform only four (4) days per week, Monday through Thursday, on pre-bid notice of same to the Business Manager, a four (4) day, ten (10) hour work week will be established. The work day shall consist of eight hours at straight time hourly rate and two hours at the overtime rate of pay. The work shift shall include ten hours work, plus one half hour for lunch.

9. Redi-Mix Concrete Plants
(a) All of the provisions contained in Article III sections 1-6 shall be applicable to employees covered by this section except as modified below.

(b) An employee who is not assigned to work after reporting therefore, shall be paid two (2) hours computed from the time he was instructed to report.

(c) A senior employee who reports to work at the time he was instructed to report may leave the yard after the two (2) hour shape time has expired. However, if a less senior employee is called upon to work, the senior employee who chose to leave will only be entitled to the two (2) hour shape pay. If the senior employee elects to remain at the yard beyond the two (2) hour shape time he will be given preference for work.

(d) The work day shall start at 7:00, 7:30 or 8:00 a.m. or such other time mutually agreed to between the Union and Employer; however, an employee's starting time is not required to be uniform throughout the week.

(e) The duties of the Teamster shop steward at a redi-mix plant will include but not be limited to: visiting job sites when necessary to determine whether concrete can be delivered, transporting vehicles for repair, painting and maintenance; transporting new vehicles to yard; pick-up parts and materials when required by the Employer. The Employer may assign the shop steward and yardmen to drive a redi-mix truck for deliveries when the Employer determines in its reasonable discretion that available work

9

does not warrant using other drivers. The shop steward shall be the last driver to leave the yard on any day when he or she is required to drive a redi-mix truck. Assigning a shop steward to drive shall not be abused by the Employer.

(f)  On any day when the shop steward is required to drive a ready-mix truck, he or she has the option of substituting in his or her place a yardman or a hopper man who can drive a ready mix truck. In that event, the shop steward will be responsible to perform the duties of the yardman or the hopper man who is required to drive a ready-mix truck.

(g)  The duties of the yardman include waiting on customers, handling masonry material, operating the forklift and other yard machinery and equipment, moving material, and sweeping and cleaning the yard.

(h)  The regular duties of the shop steward as set forth above and the regular duties of a yardman will not be assigned to any other employee any time for any reason without the express consent of the Union.

## ARTICLE IV — SUNDAYS AND HOLIDAYS

1.  Employees who work two (2) days in the calendar week (a reporting day shall be deemed a day of work, so as to qualify for holiday pay; however, an employee must work at least one (1) day), in which any of the following holidays occur shall be paid for the holiday at straight-time rate of pay without working:

NEW YEAR'S DAY
LINCOLN'S BIRTHDAY
WASHINGTON'S BIRTHDAY
GOOD FRIDAY
DECORATION DAY
INDEPENDENCE DAY
LABOR DAY
COLUMBUS DAY
ELECTION DAY
VETERAN'S DAY
THANKSGIVING DAY
CHRISTMAS DAY

2.  The Employer shall not lay off an employee for the purpose of avoiding a paid holiday. Holidays shall be paid for irrespective of the day they may occur.

10

3.   Work performed on the following holidays shall be paid for at the rate of double-time, which includes holiday pay:

> LINCOLN'S BIRTHDAY
> GOOD FRIDAY
> ELECTION DAY
> WASHINGTON'S BIRTHDAY
> COLUMBUS DAY
> VETERAN'S DAY

4.   Work performed on the following holidays shall be paid for at the rate of triple time, which includes holiday pay:

> NEW YEAR'S DAY
> DECORATION DAY
> INDEPENDENCE DAY
> LABOR DAY
> THANKSGIVING DAY
> CHRISTMAS DAY

5.   When a holiday or holidays fall during an employee's vacation, he shall be granted an additional number of days off with pay.

6.   Work performed on Sundays shall be paid for at twice the straight-time hourly rate of pay.

7.   An employee who has worked for the Employer for at least ninety (90) days and sixty (60) days in the contract year, if laid off, shall be paid for any holiday occurring within a period of seven (7) work days of his last day of work. A laid-off employee shall be paid in the same payroll week in which he was laid off with pay also for his pro-rated vacation.

8.   By mutual consent, the Employer shall allow employees, by majority vote, and subject to approval by the Union, to switch the above named holidays to alternate holidays. When a holiday falls on Saturday the Employer has the option to work or not work Friday and pay the holiday.

11

## ARTICLE V — VACATIONS

1.   Employees shall receive vacations with pay, in accordance with the following schedule:

(a)   Four (4) weeks after twenty (20) years of seniority service, and thirty (30) days of employment in the current contract year.

Three (3) weeks after ten (10) years of seniority service.

Three (3) weeks and one (1) day after sixteen (16) years of seniority service.

Three (3) weeks and two (2) days after seventeen (17) years of seniority service.

Three (3) weeks and three (3) days after eighteen (18) years of seniority service.

Three (3) weeks and four (4) days after nineteen (19) years of seniority service.

The third (3rd) week and every additional day shall be granted to an employee in the calendar year in which he completes his tenth (10th) or other years of seniority service.

Sixty (60) days of employment in the contract year shall be required for entitlement of a full three weeks vacation for employees with ten (10) years of employment.

(b)   Two (2) weeks after one hundred and thirty (130) days of employment in a calendar year. However, an employee with five (5) years of seniority service shall receive two (2) weeks' paid vacation, provided he worked ninety (90) days in a calendar year.

(c)   One (1) week after ninety (90) days of employment in a calendar year. Employees who receive one (1) week of vacation shall receive one (1) additional day for each additional eighteen (18) days of employment not exceeding ten (10) days, in any one calendar year.

(d)   A casual employee shall be granted one (1) day's paid vacation for each eighteen (18) days of employment. An employee who does not qualify for vacation shall be paid pro rata on a daily basis.

2.   Verified employment with predecessors in interest shall be computed to determine vacation benefits.

12

3.   Employees shall be paid for vacations in advance, and those entitled to more than one (1) week shall be granted consecutive weeks.

4.   Holidays shall be counted as days worked for vacation benefits. Employees shall select vacations in accordance with their seniority. Time for vacations shall be mutually agreed upon between the Employer and the Union. For each day that an employee reports for work and receives reporting pay, he shall receive credit for one (1) day's employment for purposes of determining vacation eligibility.

5.   An employee having at least ten (10) years of service who becomes disabled and is unable to work shall receive vacation pay for the period of one (1) year following such disability.

6.   The parties agree to study the feasibility of converting the vacation benefit schedule to an amount based upon an hourly contribution amount, so long as the conversion will not effect the vacation benefit of employees covered by this Agreement as set forth above.

## ARTICLE VI — LAYOFF AND REINSTATEMENT

1.   Seniority shall be in accordance with classifications. The Union and the Employer have prepared a list containing the seniority standing of the employees which shall be reviewed at least once each year. In the event a layoff shall become necessary, the employee with the least seniority shall be the first laid off. Rehiring shall be accomplished in inverse order of layoff. However, notwithstanding the above, the shop steward shall be the last employee laid off and the first one rehired.

2.   Seniority shall not be deemed breached if an employee is rehired within one (1) year after his layoff.

3.   Senior employees shall be given first preference.

4.   Prior to changing seniority with an Employer, the employee must work for the Employer at least 30 working days. Prior to granting seniority, the Union will notify the Employer who will have ten (10) days from the date of notification to raise any objections. The Union will determine

13

whether the Employer's objection has merit and will grant the employee's seniority at its' sole discretion.

## ARTICLE VII — EXTRA EQUIPMENT AND SUB-CONTRACTING

1.   In the event the Employer hires additional equipment from Employers not under contract with the Union, the Employer's employees shall operate such equipment if they are not otherwise assigned to work, but, in any event, such hired equipment shall be operated by employees hired through the Referral Hall.

2.   So long as the Employer's seniority employees and the Employer's equipment are employed for the regular shift, there will be no restrictions on late deliveries to the Employer's plant from a quarry by sub-contractors using drivers hired through the Referral Hall.

3.   **Sub-contracting:**
The Employer agrees that if a sub-contractor is delivering material to or from the Employer's plant or worksite and is delinquent in contributions to the Local 456 Welfare, Pension, Annuity, Legal, SUB, Education & Training, PAF or Administrative dues as more fully set forth in Article's I (4a & b), X, XI, XII, XIII, XIV, XV, XVII, and XXXII, upon a written "Notice of Delinquency" delivered to the Employer by the Union, the Employer agrees to withhold any monies due the sub-contractor within 5 working days after receipt of said "Notice of Delinquency", and remit the delinquent amount to the Union. The Employer may submit a dispute regarding the delinquency to the Joint Labor Management Panel as set forth in Article XXXI of this Agreement. An Employer that fails to comply with a Union demand to withhold payments due to a sub-contractor after receipt of a "Notice of Delinquency" as more fully set forth above, will be liable to the Union for the delinquent amount.

## ARTICLE VIII — INDIVIDUAL CONTRACTS

1.   The Employer shall not make any contract with an individual employee, nor shall the Employer attempt to enter into such a contract with an employee.

14

## ARTICLE IX — PAST BENEFITS

1.    The Employer shall continue during the term of this Agreement any benefit or condition of work more favorable than those contained in this Agreement.

2.    Work presently being performed by bargaining unit employees shall continue to be performed by bargaining unit employees in accordance with the provisions of this Agreement. Equipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of this Agreement.

## ARTICLE X — WELFARE FUND

1.    The Employer agrees to comply with the Trust Agreement, By-Laws and the Rules and Regulations of the Westchester Teamsters Welfare Fund as the same may be amended from time to time except that no amendment may effect the Employer's obligation to contribute to the Fund beyond the obligation contained in this Agreement and the aforesaid Trust Agreement, By-Laws, Rules and Regulations shall be a part of this Agreement as though the same were more fully set forth herein.

The Employer shall pay to the Fund at the Fund Office the amount of five dollars and fifty cents ($5.50) for each hour worked by employees covered by this Agreement within each respective week, including shape-time, straight-time, over-time, holiday and vacation pay, up to but not to exceed forty (40) hours per week. Payments to the Fund shall not be required on the basis of sick leave or funeral leave as set forth in this Agreement.

The amount set forth above includes five cents (.05) per hour which will be segregated in a special account to fund an Employer Consortium for Haz-Mat Testing and OSHA requirements.

A third party provider will manage a consortium providing service to signatory contractors including occupational, Haz-Mat and industrial medical and compliance services as required by project owners or federal, state or local statute. The Union will have no responsibility to require tests of its members. All records

15

will be maintained at the consortium or Employers as required by law or project owner contract policy. The parties agree that with the exception of the Welfare Funds' obligation to pay for the service, limited to the balance in the segregated account, the Fund and the Union shall assume no liability in connection with the testing process and the results thereof, and the parties agree to indemnify and hold the Fund and the Union harmless in connection with privacy and confidentiality issues, and the service provided pursuant to this Agreement.

## ARTICLE XI — PENSION FUND

1. The Employer agrees to comply with the Trust Agreement, By-Laws and the Rules and Regulations of the Westchester Teamsters Pension Fund as the same may be amended from time to time except that no amendment may affect the Employer's obligation to contribute to the Fund beyond the obligation contained in this Agreement and the aforesaid Trust Agreement, By-Laws, Rules and Regulations shall be a part of this Agreement as though the same were more fully set forth herein.

The Employer shall pay to the Fund at the Fund Office the amount of five dollars and thirty-five cents ($5.35) per hour for each hour worked by employees covered by this Agreement within each respective week, including shapetime, straight time, over time, holiday and vacation pay, up to but not to exceed forty (40) hours per week. Payments to the Fund shall not be required on the basis of sick leave or funeral leave as set forth in this Agreement.

## ARTICLE XII — ANNUITY FUND

1. The Employer agrees to comply with the Trust Agreement, By-Laws and the Rules and Regulations of the Westchester Teamsters Annuity Fund as the same may be amended from time to time except that no amendment may affect the Employer's obligation to contribute to the Fund beyond the obligation contained in this Agreement and the aforesaid Trust Agreement, By-Laws, Rules and Regulations shall be a part of this Agreement as though the same were more fully set forth herein.

16

The Employer shall pay to the Fund at the Fund Office the amount of five dollars ($5.00) per hour for each hour worked by employees covered by this Agreement within each respective week, including shape-time, straight-time and over-time up to but not to exceed forty (40) hours in each week. The Employer shall contribute to the Fund on the same basis for all hours paid to employees in the form of holiday pay or vacation pay. Payments to the Fund shall not be required on the basis of sick leave or funeral leave as set forth in this Agreement.

## ARTICLE XIII — SUPPLEMENTAL UNEMPLOYMENT BENEFIT FUND

1. The Employer agrees to comply with the Trust Agreement, By-Laws and the Rules and Regulations of the Teamsters Local 456 Supplemental Unemployment Benefit Fund as the same may be amended from time to time except that no amendment may affect the Employer's obligation to contribute to the Fund beyond the obligation contained in this Agreement and the aforesaid Trust Agreement, By-Laws, Rules and Regulations shall be a part of this Agreement as though the same were more fully set forth herein.

The Employer shall pay to the Fund at the Fund Office a sum equal to twenty-five cents ($ .25) per hour for each hour worked by employees covered by this Agreement within each respective week, including shape-time, straight-time and over-time. The Employer shall contribute to the Fund on the same basis for all hours paid to employees in the form of holiday pay or vacation pay. Payments to the Fund shall not be required on the basis of sick leave or funeral leave as set forth in this Agreement.

2. The Trustees of the Supplemental Unemployment Benefit Fund shall have the authority to direct contributions otherwise intended for the Supplemental Unemployment Benefit Fund to either the Teamsters Local 456 Welfare Fund, Pension Fund, Annuity Fund, Legal Fund or Education and Training Fund from time to time, at any time when the total assets of the Supplemental Unemployment Benefit Fund exceed five million dollars ($5,000,000).

17

## ARTICLE XIV — EDUCATION AND TRAINING FUND

1.    The Employer agrees to comply with the Trust Agreement, By-Laws and the Rules and Regulations of the Teamsters Local 456 Education and Training Fund as the same may be amended from time to time except that no amendment may affect the Employer's obligation to contribute to the Fund beyond the obligation contained in this Agreement and the aforesaid Trust Agreement, By-Laws, Rules and Regulations shall be a part of this Agreement as though the same were more fully set forth herein.

The Employer shall pay to the Fund at the Fund Office a sum equal to five cents ($ .05) per hour for each hour worked by employees covered by this Agreement within each respective week, including shape-time, straight-time and over-time up to but not to exceed forty (40) hours in each week. The Employer shall contribute to the Fund on the same basis for all hours paid to employees in the form of holiday pay or vacation pay. Payments to the Fund shall not be required on the basis of sick leave or funeral leave as set forth in this Agreement.

## ARTICLE XV — LEGAL SERVICES FUND

1.    The Employer agrees to comply with the Trust Agreement, By-Laws and the Rules and Regulations of the Teamsters Local 456 Legal Services Fund as the same may be amended from time to time except that no amendment may affect the Employer's obligation to contribute to the Fund beyond the obligation contained in this Agreement and the aforesaid Trust Agreement, By-Laws, Rules and Regulations shall be a part of this Agreement as though the same were more fully set forth herein.

The Employer shall pay to the Fund at the Fund Office a sum equal to twenty cents ($ .20) per hour for each hour worked by employees covered by this Agreement within each respective week, including shape time, straight-time and over-time up to but not to exceed forty (40) hours in each week. The Employer shall contribute to the Fund on the same basis for all hours paid to employees in the form of Holiday Pay or Vacation Pay. Payments to the Fund shall not be required on the basis of sick leave or funeral leave as set forth in this Agreement.

18

Legal Services Fund contributions shall be added to the wage, taxed in accordance with IRS regulations and then remitted to the Fund.

## ARTICLE XVI — NEW YORK STATE DISABILITY BENEFITS

1.    The Employer will provide coverage for all of its employees covered under the terms of this Agreement under the New York State Disability Law. The cost of that coverage will be borne by the Employer and his employees in the amounts specified for each of them by the New York State Disability Benefit statute.

## ARTICLE XVII — COLLECTION OF EMPLOYER CONTRIBUTIONS TO THE BENEFIT FUNDS

1.    The failure of any Employer to pay required wages and/or to make required contributions to the Welfare, Pension, Annuity, SUB, Legal and Training Funds; or to remit in a timely fashion Dues and PAF Check-off; or in the event the Employer is delinquent in making contributions pursuant to this Agreement and fails to pay assessed interest as the result of said delinquencies; or fails to pay legal and auditing fees and court costs assessed against such delinquent Employer; or refuses to permit an audit of the Employer's books and records by a representative of the Fund upon ten days prior notice on regular business days during normal business hours in order to ascertain whether said payments are being properly computed and made; any such failure mentioned above shall be deemed to constitute a violation of this Agreement and the Union, upon reasonable notice, shall be authorized to remove employees from the job, in which case the employees so removed shall be paid a day's pay of 8 hours for each day until the Employer settles his delinquent payments of contributions, interest, legal and auditing fees and court costs with the Benefit Fund Administrator and/or permits an audit of the Employer's books and records. ·If any Employer has a record of delinquency in contributions to the Benefit Funds on a prior job, the Union shall be within its right to refuse to permit employees to work for such Employer, until all such delinquencies have been paid to the respective Funds, including interest and legal and auditing fees and costs.

19

The Employer may not terminate, lay off or replace or take any disciplinary action against any employee who refuses to work as a result of the provisions set forth above.

If the Trustees or the Fund Administrator of the Benefit Funds is required to utilize the services of an attorney to collect Employer delinquencies or the services of an accountant to conduct an audit of the Employer's books and records as the result of the Employer's delinquency, the delinquent Employer may be required to pay, in addition to the delinquency, interest at the rate of ten percent (10%) per annum, together with liquidated damages in the amount of ten percent (10%) of the total delinquency and the reasonable cost of auditing services and legal fees in the amount of fifteen percent (15%) of the delinquent amount, in accordance with ERISA Section 502(g).

All contributions required to be made to the Benefit Funds by the Employer shall be made on a weekly basis together with a completed contribution report form to be furnished by the Benefit Funds, indicating the names of all employees, number of hours worked or paid and amount of hourly wages, together with the amount of contribution for each employee to each fund. The periodic reporting forms must be filed by the Employer with the funds regardless of whether any contributions are due and owing the funds in the reporting period.

The Trustees of the Benefit Funds in their discretion may permit an Employer to contribute to the Benefit Funds on a monthly instead of a weekly basis where the contribution record of the Employer justifies such action.

At the discretion of the Union and/or the direction of the Trustees of the Teamster Local 456 Benefit Funds an Employer must file with the Trustees of the fringe benefit funds a surety company bond acceptable to the Trustees, in an amount no less than $25,000 in order to ensure payment to the various fringe benefit funds. Based on the Employer's contribution record, and the number of Teamsters employed by the Employer, the Trustees may require a greater or lesser surety bond or eliminate the requirement for a surety bond.

With the exception of the provisions contained in Section 4 of this Article, the remedies set forth herein shall not be subject to any form of grievance procedure or arbitration, nor shall said remedies be the exclusive

20

remedies available to the Union with respect to an Employer who is in violation of the provisions of this section.

2.    No officer, agent, representative or employee of the Union or of any Employer or employee benefit fund shall be deemed to be an agent or representative of the Board of Trustees of the respective Fund or shall be deemed as authorized to make any oral or written representations or give any form of commitment which may be relied upon by any Employer, employee, his or her spouse, beneficiary or dependent. Any such representations or commitments may only be made by the Board of Trustees in their official capacity.

3.    The Fund and/or the Union shall have the power to require any Employer, and the Employer, when required, shall furnish any reports and information as they may require in the performance of their duties in the collection of contributions to the Fund. Benefits may be extended to Employees and full-time paid officers of the Union, Employees of the Westchester Teamsters Pension Fund, the Westchester Teamsters Welfare Fund, the Teamsters Local 456 Annuity Fund, the Teamsters Local 456 Education and Training Fund, the Teamsters Local 456 Legal Services Fund, the Westchester Teamsters Supplemental Unemployment Benefit Fund, provided contributions are paid on behalf of such persons by the Union, Welfare Fund, Pension Fund, Annuity Fund, Education and Legal Services Fund and Supplemental Unemployment Benefit Fund, as the case may be. Payment will be made weekly to the Fund by check, payable to the Westchester Teamsters Benefit Funds.

4.    If an Employer fails to remit contributions to the fringe benefit funds as required by this Agreement, the Union or the Board of Trustees for the Benefit Funds shall have the right to take whatever steps are necessary to secure compliance with this section. The Union and or the Board of Trustees shall determine whether a grievance regarding this Section shall be submitted to arbitration or whether other remedies provided for under State or Federal Law including legal action in a court of competent jurisdiction shall be pursued with respect to an Employer who is in violation of the provisions of this Section. If the Board of Trustees decide to pursue the remedy of arbitration, said arbitration shall be referred to an independent arbitrator

21

chosen by the Board of Trustees or to the American Arbitration Association. The Employer's liability for payment under this Section shall not be subject to any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

## ARTICLE XVIII — DOUBLE BREASTED

1.   In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, to protect the benefits to which employees are entitled under this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work and benefits, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement, within the geographical area of this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners, or stockholders) exercises either directly or indirectly any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

2.   A charge of a violation of Section (1) of this Article may be filed by the Union and/or the Trustees of any of the Trust Funds provided for in this Agreement, and shall be considered as a dispute under this Agreement and shall be processed in accordance with procedures for the handling of grievances and the final binding resolution of disputes; however, a grievance under this section which the parties fail to resolve shall be referred to binding arbitration in accordance with the rules and regulations of the American Arbitration Association. As a remedy for violations of this Section, the arbitrator (or arbitration body) is empowered at the request of the Union and/or the Trustees of the joint Trust Funds, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (2) pay to the affected joint Trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or other articles of

22

this Agreement. A complaint alleging a violation of Section (1) of this Article may also be filed by the Union and/or Trustees of the funds in the United States District Court for the Southern District of New York.

## ARTICLE XIX — EMPLOYEE'S EXPENSE

1.   The Employer shall pay employees all reasonable expenses incurred by them while they are away from home in furtherance of the Employer's business.

2.   The Employer shall pay employees for the time lost on account of court appearances in the Employer's behalf, and for presence at hearings conducted before the Worker's Compensation Board.

## ARTICLE XX — PAY AND RECORDS — 401(K) SAVINGS PLAN

1.   The Employer shall pay wages weekly in cash. The Employer shall maintain records of the employment of employees, and comply with all the laws governing the employment of employees (including, but not limited to, Worker's Compensation and Social Security).

2.   The Employer agrees that employees covered under this Agreement will be eligible to participate in the Teamsters-National 401(k) Savings Plan at such time as it is administratively feasible.

The Employer will execute a Participation Agreement with the Union and the Trustees of the Teamsters-National 401(k) Savings Plan (the Plan) evidencing Employer participation in the Plan within 30 days of notice that the Plan is administratively feasible. Upon implementation, each Employer will make or cause to be made payroll deductions from participating employees wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. The Employer will forward withheld sums at such time, in such form and manner as required pursuant to the Plan and Declaration of Trust of the Teamsters National 401(k) Plan (Trust).

23

## ARTICLE XXI — OUTSIDE CONTRACTS

1.    The Employer shall not, during the term of this Agreement, contract or agree to contract or otherwise assign work performed by employees covered by this Agreement to any other firm, contractor, corporation, partnership, individual or otherwise, except as provided by ARTICLE VII hereof. It is agreed that employees covered by this Agreement shall continue to do all types of work heretofore performed by them. The Employer shall use employees covered hereby to transport cranes, cats or shovels.

## ARTICLE XXII — DISCHARGE

1.    An Employer may discharge an employee for just cause, however, the discharged employee shall continue to receive his regular wage in accordance with Article XXXI of this Agreement.

## ARTICLE XXIII — NO STRIKE - NO LOCKOUT

With the exception of disputes for contributions owed by the Employer to the Union Benefit Funds:

(a) The Union agrees that there will be no strike during the term of this Agreement. The Employer agrees that there will be no lockout of the members of the Union during the term of this Agreement.

(b) The Union and the Employer agree that all disputes arising under the provisions of this Agreement, with the exception of disputes for delinquent Benefit Fund contributions, shall be resolved through the grievance and arbitration provisions set forth in ARTICLE XXXI of this Agreement.

## ARTICLE XXIV — PICKET LINE

1.    It shall not be a breach of this contract nor cause for discharge, replacement or other discipline for any employee to refuse to cross a picket line approved by the Union.

## ARTICLE XXV — LEAVE OF ABSENCE FOR DEATH IN FAMILY

1.    The Employer shall grant three (3) calendar days off without loss of pay to an employee who has a death in

24

his immediate family, inclusive of the day of the funeral. "Immediate family" shall include: parents, foster parents, spouse, children, sisters and brothers. In the event of the death of a father-in-law or mother-in-law, or a grandparent, the employee shall be allowed the day of the funeral without loss of pay, provided he attends the funeral.

## ARTICLE XXVI — WORKING CONDITIONS

*The following conditions of work shall be observed:*

1.    At least one man working under the provisions of this Agreement shall at all times be assigned to the operation of A-Frames, winch trucks (operated from inside), and dual purpose grease and fuel trucks.

2.    One man shall be assigned to oil distributor trucks and to a fuel truck when servicing equipment.

(a) Employees working on fuel trucks shall be guaranteed forty (40) hours per week.

(b) Employees working on fuel truck operations on construction job sites shall receive a premium of five ($5.00) dollars per day above the rate set forth in Article II.

(c) Employees working on fuel operations on construction job sites shall receive eight (8) sick days and one personal day leave per year.

(d) Employees working on fuel operations on construction job sites may not be required to transfer to another vehicle other than for the purpose of hauling fuel during each forty hour guaranteed week.

(e) The operation of fuel trucks shall be offered to employees based upon seniority. During each forty hour guaranteed period, if an employee with less seniority chooses to operate the fuel truck, said employee may not be replaced by a more senior employee due to weather conditions, etc.

(f) Restrictions: Employers may not carry fuel for equipment in fifty gallon drums or five gallon cans unless a driver is employed and the above requirements are adhered to. In cases of emergency, such as fuel company's failure to load an Employer's equipment at designated times which would result in a work stoppage, the Employer may request the Union's permission to fuel the equipment without penalty of the above requirements, until the normal

25

fueling process is reestablished. The Union's consent shall not be unduly withheld in an emergency situation.

(g) An Employer who is found to have violated any of the provisions set forth in this Article with regard to the operation of fuel trucks hereby agrees to pay the driver who would otherwise be employed to operate the fuel truck a minimum of forty hours at straight-time pay as provided for in this Article.

3. On outside construction job sites, the Employer shall supply a heated trailer with telephone for employees covered under this Agreement.

4. In those Companies where the Union represents automotive mechanics, mechanic's helpers, welders, stockroom men and working foremen, such employees shall continue to perform all of the duties heretofore performed by them.

5. The starting and checking of all trucks and equipment covered hereby shall be performed by employees covered hereunder.

6. The Employer shall use equipment covered by this Agreement and operated by employees covered hereby for the purpose of delivering materials, parts, cones, planks or any equipment or material for construction or towing, where such equipment can be used for such purposes, in the judgement of the Union delegates.

(a) The Employer shall subcontract for the delivery of ready mix concrete and asphalt only to companies whose wages and other economic benefits are equivalent to the area standards established by the Union unless said companies are unable or unwilling to supply ready mix or asphalt to the Employer.

7. If an Employer does not receive dynamite from a distributor in either Westchester or Putnam Counties, having a contract with the Union, he shall assign two (2) men to the dynamite truck at all times for servicing, and shall engage two (2) men for loading or unloading caps or dynamite.

8. Employees covered hereby shall operate snow plows, whether they be jeep, suburban, pick-up or any other type of vehicle.

26

9. The Employer may use pick-ups or suburbans for transporting personnel and hand tools. However, if any such vehicle is used to transport any other materials, it is agreed that the same shall be operated by an employee covered hereby, who shall continue to operate such vehicle.

10. Employers having plants outside the geographical area covered hereby may not use trucks or equipment from any such plant in the area covered hereby, if the Employer has trucks or equipment normally used in the area covered by this Agreement available.

11. When employees are required to move vehicles covered by this Agreement from the job back to the yard or another job, they shall be provided transportation back to the starting point and they shall be paid the appropriate rate until transported to the starting point for all time so spent.

12. No ready-mix concrete mixer trucks of any type of design shall carry more than 15 cubic yards of concrete. No restriction or limitation is placed on any other vehicle, load or material.

13. Employees shall not be held responsible for over loaded vehicles. Whenever a driver is penalized because of such overload, the Employer shall bear all cost in connection with such overload penalty and shall pay damages assessed against the employee, including accrued overtime for delay and/or lost earning opportunity that the employee might suffer. In the event the employee shall suffer a revocation of his Chauffeur's license solely because of violation of any laws by the Employer, the Employer shall provide suitable and continued employment for such employee, at not less than his regular earnings, for the entire period of revocation of license, and the employee shall be reinstated in the seniority he held prior to revocation of his driver's license, after his driver's license is restored.

14. When trucks work in Westchester or Putnam Counties on Saturday or any premium day, there must be a mechanic on duty. The Employer shall supply mechanics with tools larger than 1/2 inch.

15. An employee covered hereby shall be assigned to a truck that supplies both fuel and grease.

27

16. The Employer shall call the Union for help not later than 4:30 p.m. of the day preceding the day such help is required to report for work.

17. If an Employer transfers equipment outside the territorial jurisdiction of the Union for lack of work, and if thereafter the Employer obtains work within the Union's jurisdiction for which the transferred equipment is suitable, the Employer will return the equipment without undue delay.

18. Hazardous/Toxic Waste

(a) Conditions of employment at a hazardous/toxic waste site shall be subject to all safety and insurance regulations required by appropriate governmental agencies.

(b) Employees engaged in hazardous/toxic waste removal, on a State or Federally designated hazardous/toxic waste site, where the employee comes in contact with hazardous/toxic waste material and when personal protective equipment is required for respiratory, skin or eye protection, the employee shall receive an additional 20% premium above the hourly wage set forth in this Agreement.

(c) The Union shall provide certified drivers.

19. At all times during the work day safety and personal protective equipment supplied by the Employer or otherwise required by OSHA, such as safety shoes, may be worn in accordance with OSHA regulations by the Employee. Failure to comply with this paragraph subjects the Employee to suspension, reduction in seniority or discharge through the grievance procedure (Article XXXI).

20. A driver operating a specialized vehicle on a job site such as an attenuator or water delivery truck may be assigned to operate an alternate vehicle during the workday and, if necessary, reassigned back to the specialized equipment. The driver will receive the highest rate of pay for vehicles operated during the day, for the entire day.

No employee other than an employee covered hereby will operate specialized vehicles including attenuator and water trucks on or off the job site.

28

## ARTICLE XXVII — WORKING TEAMSTER FOREMAN

1.    Working Teamster Foreman on Road and Heavy Construction job sites, supply yards and redi-mix plants.

(a)  A Working Teamster Foreman shall be assigned each supply yard, redi-mix plant and each road and heavy construction job site at all times, and shall be furnished with a vehicle for means of transportation. If an Employer has more than one job site in operation, the Working Teamster Foreman will cover all of such job sites. The Working Teamster Foreman may be assigned the duties of a Safety Coordinator at the discretion of the Employer and under the direction of the Employer. However, the Union shall not be liable for any act of negligence of any of its members. The Working Teamster Foreman shall be appointed by mutual agreement of the Union and the Employer from the Employer's seniority list or from among the union's qualified members and shall be designated as the Teamster Shop Steward by the Union.

(b)  Annually, there shall be a joint Union and Employer review of the Working Teamster Foreman's performance to determine status for the following year. If the Employer is not satisfied with the Working Teamster Foreman's performance for two consecutive years the Union agrees to appoint a replacement in accordance with Paragraph 1(a) of this Article. This does not restrict the Employer from seeking recourse under Article XXXI, Grievance Procedure for more immediate matters.

(c)  The Working Teamster Foreman shall be paid a rate of pay equal to the rate of the highest rate of pay of any employee in such yard working under the provisions of this Agreement.

2.    Working Teamster Foreman on Building Construction job sites:

(a)  A Working Teamster Foreman shall be employed on all building construction job sites, including condominium cluster developments, for which the general construction value exceeds $8 million ($8,000,000) dollars. In the event such Employer has more than one project which exceeds $8 million ($8,000,000) dollars, the Working Teamster Foreman shall cover all of such projects.

(b)  The Working Teamster Foreman shall be employed by the General Contractor, Owner, Developer, Broker,

29

Prime Contractor, Construction Manager, Investment Builder or whichever such designated individual, company or firm is responsible to perform the construction or subcontracts that work to other Employers on the job.

(c) The parties will meet at a prejob conference to determine when the Working Teamster Foremen's employment will commence. It is the intent of the parties that the Working Teamster Foreman shall be employed from the beginning of the job until the building or development is seven-eights completed. Should there be any dispute concerning the termination date of the Working Teamster Foreman pursuant to this paragraph, the matter shall be submitted to the grievance panel in accordance with the procedures set forth herein. The panel shall determine, based upon all of the facts, whether the particular job has reached the seven-eighths completion stage.

3.   The duties of the Working Teamster Foreman shall be assigned by the Employer in connection with the receiving, shipping and distributing of materials and coordinating the daily routine of truckers and drivers. On jobs where a Working Teamster Foreman is employed and job conditions warrant and are practical, delivery shall be routed through a designated location selected by the Employer. It shall be one of the duties of the Working Teamster Foreman to check the deliveries and re-route the trucks to their proper location on the job site. The designated area may be changed as job conditions warrant.

(a) The Working Teamster Foreman may be assigned the duties of a Safety Coordinator at the discretion of the Employer and under the direction of the Employer. However, the Union shall not be liable for any act of negligence.

(b) The Working Teamster Foreman shall be referred to the Employer through the Union Referral Hall from among the union members that the Union determines have the necessary qualifications to be a Working Teamster Foreman.

(c) To insure that all vehicles operated on the job site are operated in a safe and efficient manner and to supply and transport parts, materials and building supplies the Working Teamster Foreman shall be employed at all times when work is performed on the job site by any trade and of any nature. The Working Teamster Foreman shall not deprive employees on the seniority list of the Employer or

30

the seniority list of any other Employer of their normal work opportunities.

(d)  In the event of a lay-off, the Working Teamster Foreman shall be the last employee to be laid off. The Union shall designate the Working Teamster Foreman as the Union Shop Steward on the job and he shall be allowed a reasonable amount of time to conduct union business consistent with the concept that he is a Working Teamster Foreman.

(e)  The Working Teamster Foreman shall have no authority to direct that economic or other action be taken against an Employer. He shall be required to report any unresolved grievance and/or dispute to the appropriate union official. The Employer shall have the authority to impose proper discipline, including discharge, in the event the Working Teamster Foreman has taken unauthorized strike action, or instigated a work stoppage which is not approved by the Union, in violation of this Agreement.

(f)  The Union shall have the right to remove and replace the Working Teamster Foreman at any time.

(g)  The Working Teamster Foreman shall be paid a rate of pay equal to the rate of the highest rate of pay of any employee in such yard working under the provisions of this Agreement.

## ARTICLE XXVIII — JOB CONFERENCE

1.   An Employer who is a General Contractor, Owner, Developer, Broker, Prime Contractor, Construction Manager, Investment Builder or whatever such designated individual, Company or firm is responsible to perform the construction or sub-contract that work to other Employers on the job, shall meet with the Union prior to the commencement of any job, project, construction or demolition work, to discuss mutual problems in connection therewith. The names of all subcontractors shall be furnished to the Union at such Conferences, if known by the Employer at that time, and in any event, the names of such sub-contractors shall be furnished to the Union before said sub-contractors shall commence work.

31

## ARTICLE XXIX — NON DISCRIMINATION CLAUSE

1.    The Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, national origin or age (between the years of 40 and 70), nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, color, religion, sex, national origin or age (between the years of 40 and 70).

2.    The Employer and the Union agree that there will be no discrimination by the Employer or the Union against any employee because of his or her membership in the Union or because of any employee's lawful activity and/or support of the Union.

## ARTICLE XXX — DRUG FREE
## WORKPLACE PROGRAM

1.    Where an Employer has reasonable cause to believe that an employee is a drug abuser, substance abuser or alcohol abuser, the Employer can suspend the suspected abuser, not to exceed three (3) days, and require that the employee meet with the Union's Employee Assistance Program Director.

2.    The Union's Employee Assistance Program Director will arrange for testing of the suspected abuser to determine whether the employee has a drug, substance or alcohol abuse problem.

3.    If the test reveals that the employee is not a drug, substance or alcohol abuser, he shall be immediately returned to work with no loss of pay not to exceed three (3) days.

4.    If the test reveals that the employee is a drug, substance or alcohol abuser, he will be suspended with no pay and the employee will be given the opportunity to participate in a rehabilitation program to suit his individual need under the guidance of the Union's Employee Assistance Program Director.

5.    If the employee completes the rehabilitation program and subsequently tests clean of drug, substance or alcohol abuse, the employee shall be returned to his previous position with no loss of seniority.

32

6. An employee that fails to meet with the Union's Employee Assistance Program Director or refuses to submit to testing for drug, substance or alcohol abuse or refuses to participate in the Drug Free Workplace Program or the Detoxification program after testing positive for drug, substance, or alcohol abuse, or who fails three (3) drug, substance or alcohol abuse tests, shall be terminated without recourse to the grievance procedure contained in the Collective Bargaining Agreement.

7. In accordance with Federal Department of Transportation requirements, the Employer and the Union agree to form a "Substance Abuse Testing Consortium" (SAT Consortium). The SAT Consortium will perform all pre-employment, random, post accident and other required testing, if any, of covered employees of the bargaining unit. Pursuant to an Agreement with the Teamsters Local 456 Health and Welfare Fund, testing will be conducted exclusively by Clarity Testing Services, unless the parties agree in writing to utilize the services of other or additional providers of testing services.

8. The cost of testing, detoxification or other services will be paid by the Teamsters Local 456 Employee Assistance Program or by the Westchester Teamsters Welfare Fund.

9. It is agreed that the procedure set forth above shall be the exclusive procedure for resolving disputes concerning drug, substance or alcohol abuse and testing.

### ARTICLE XXXI — GRIEVANCE PROCEDURE

1. GRIEVANCE PROCEDURE

(a) All grievances or disputes involving any controversy, dispute or misunderstanding arising as to the meaning, application or observance of any provision of this Agreement shall be handled in the manner hereinafter set forth.

(b) It is the expressed intention of the parties that all grievances arising on the job be resolved through the direct efforts of the Union's Shop Steward and the Employer's representative.

*Step 1.* In the event that a grievance cannot be resolved through the direct efforts of the Union's Shop Steward and the Employer's representative then it will be incumbent upon the Union's Shop Steward and the Employer's representative to contact, in the case of the

33

Union, the Business Manager or Business Agent and in the case of the Employer, the Association Representative or the Independent Employer.

Step 2.   The Union's Business Manager and/or Business Agent and the Association Representative or the Independent Employer will be required to meet with the involved parties and attempt to resolve the grievance and/or dispute within a period not to exceed 24 hours from the time when the dispute first became known to either the Union's Business Manager and/or Business Agent and the Association Representative or the Independent Employer.

Step 3.   If the disposition of the matter in Step 2 is not satisfactory, either party has a right to request a meeting of a Joint Committee composed of two (2) Employer representatives and two (2) Union representatives with the power to hear and determine the appropriate disposition of the said grievance and/or dispute.

(c) The Employer representatives to the Joint Committee will be selected by the appropriate Association representative or the Independent Employer and the Union representatives to the Joint Committee will be selected by the Union's Business Manager.

(d) The Joint Committee referred to herein shall have the right to investigate all facts pertaining to the grievance and/or dispute. The Joint Committee, as well as the Association and Union's representative shall upon each dispute or grievance processed in accordance with this Article, have the right to examine time sheets and any other records pertaining to the grievance and/or dispute, in furtherance of its disposition. The Employer and the Union shall be entitled to present such evidence and witnesses before the Joint Committee hearing in support of their respective positions as they see fit.

A decision by a majority of the Joint Committee shall be submitted in writing and shall be final and binding upon the employees and parties involved. Failure of either party involved to comply with any final decision of the Joint Committee or to submit to the jurisdiction of the Joint Committee shall give the other party immediate right to all legal and economic recourse.

(e) The parties expressly agree that all grievances and/or disputes which may ultimately lead to a work stoppage

34

shall be handled in accordance with the grievance procedure and that neither party will resort to a strike or lockout during the term of this Agreement without first permitting the other party the opportunity to avail itself of the grievance procedures set forth in this Article.

(f) In the event the Joint Committee is unable to render a decision then the committee shall select a neutral umpire to hear and resolve the dispute and the determination of the neutral umpire shall be final and binding upon the employee and the Employer and all parties to this Agreement. Failure of either party involved to comply with any determination of the neutral umpire shall give the other party immediate right to all legal and economic recourse.

(g) In the event the parties cannot agree on the selection of a neutral umpire the matter shall be referred for final disposition to the American Arbitration Association for the appointment of an arbitrator who shall have full authority to hear and resolve the dispute in accordance with the Rules and Regulations of the American Arbitration Association.

(h) Only with regard to cases arising under Article XXII (Discharge) will the following procedure be followed:

The affected employee will continue to receive his regular wage notwithstanding the discharge until such time as the Joint Committee, as set forth in paragraph (c) of this Article, is designated to hear the dispute, but not to exceed forty-eight (48) hours from the time of discharge. If the Joint Committee is designated within the forty-eight (48) hour period the affected employee will continue to receive his regular wage until such time as the committee meets and renders a final and binding decision involving the question of whether the discharge was for just cause, or refers the matter to Arbitration but not to exceed five (5) working days from the date of discharge.

## ARTICLE XXXII — INDUSTRY ADVANCEMENT FUND

1. The Heavy Construction Industry Advancement Fund, also known as the Construction Industry Council of Westchester and Hudson Valley, Inc., hereinafter referred to as the "HCIAF" has been established for the purpose of

35

promoting industry advancement programs to improve the industry.

2.    All Employers bound by the terms of this Agreement shall remit to the HCIAF Fund thirty cents (30¢) per hour for the period 7/01/05-6/30/06, and thirty-five cents (35¢) per hour for the period 7/01/06-6/30/07, for each hour worked by each employee covered by this Agreement.

HCIAF contributions shall be made by separate check payable to the Heavy Construction Industry Advancement Fund. There shall be no co-mingling of these funds with funds of the Union or with fringe benefit funds. All monies received by the fund office for HCIAF are to be treated as trust funds and shall be immediately remitted to the HCIAF upon receipt thereof.

3.    The Union shall have no control over the utilization of the Industry Advancement Fund but will be consulted as to suggestions for the advancement of the industry.

## ARTICLE XXXIII — MOST FAVORED NATIONS CLAUSE

In the absence of approval by the Association Representative, should the Union knowingly allow its members to work for a competitor of the Employer for wages and fringe benefits less than the amounts set forth in this Agreement, or under conditions less favorable than those established by this Agreement; then the wages, fringe benefits and working conditions contained in this Agreement shall, upon reasonable notice by the Association to the Union, be deemed changed to conform to the more favorable conditions permitted by the Union.

This clause shall not apply to isolated or emergency situations which may occur from time to time under unusual job conditions nor when a special project agreement is established and made available to all signatory Employers pre-bid.

## ARTICLE XXXIV
## WORKER'S COMPENSATION - ADR PROGRAM

The Union agrees to adopt and be bound by the President's Council of the Hudson Valley Workers Compensation Medical Care and Dispute Prevention and Resolution Program (Presidents' Council ADR Agreement

36

and/or ADR Program). The contractor and/or subcontractor can provide Worker's Compensation through the ADR Program so long as the contractor and/or subcontractor adopt and execute the President's Council ADR Agreement. The determination to utilize the Worker's Compensation ADR Program will be at the exclusive option of the contractor and/or subcontractor.

## ARTICLE XXXV — SAVINGS CLAUSE

In the event any term, condition or provision of this Agreement, in whole or in part, is illegal, invalid or unenforceable in a court of competent jurisdiction or declared illegal, invalid or unenforceable by an appropriate governmental agency or by the decision of any body competent and authorized to act herein, only those provisions or parts so affected shall be rendered invalid. The parties desire the balance of the contract to continue in full force and effect to the same extent as if the illegal, invalid or unenforceable part had never been incorporated in this Agreement. In the event any part is illegal, invalid or unenforceable, the parties shall immediately meet to correct the parts so affected.

## ARTICLE XXXVI — DURATION OF AGREEMENT

1.   This Agreement shall be effective as of June 1, 2005 and shall continue in full force and effect until the 31st day of May, 2008 and unless sixty (60) days written notice is given prior to the expiration by the Union to the Employer or the Employer to the Union, it shall remain in full force and effect for a further period of one year, and from year to year thereafter provided, however, that any Employer on not less than sixty (60) days written notice prior to the expiration date of this Agreement or any of its extensions can notify the Union in writing of its desire to withdraw and terminate the Agreement as it relates to itself. In the event written notice of termination is given, the parties shall meet forthwith to negotiate a new Agreement and any and all terms of such new Agreement shall be retroactive to the termination date.

2.   This Agreement shall be binding upon the parties, their successors and assigns, by operation of law or contract.

37

## HEAVY CONSTRUCTION AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be signed by their duly authorized representative and have affixed hereto the seals of their respective organizations the day and year first above written.

**FOR THE EMPLOYER:**

Construction Industry Council of Westchester and Hudson Valley, Inc.

By: _____     Date: _____
     (Association Representative)

**FOR THE EMPLOYER:**

The Building Contractors Association of Westchester
and Mid-Hudson Valley, Inc.

By: _____     Date: _____
     (Association Representative)

**FOR THE UNION:**

Teamsters Local 456 a/w International Brotherhood of Teamsters

By: _____     Date: _____
     (Business Manager)

38

## HEAVY CONSTRUCTION AGREEMENT
### (New Association Members)

The undersigned Employer hereby applies for membership in the undersigned Association and agrees to be bound by all of the terms of the Association's Constitution and By-Laws, and by all the terms and conditions set forth in the Heavy Construction Agreement presently in effect between Teamsters Local 456, affiliated with the International Brotherhood of Teamsters, and the said Association, as the same may be amended, modified or extended from time to time, and acknowledges its acceptance of the said Association to serve as its designated Representative for purposes of Collective Bargaining.

**FOR THE EMPLOYER:**

_____

(Name of Employer)}

_____

(Address of Employer)

By: _____     Date: _____

(President)


**FOR THE UNION:**
Teamsters Local 456 a/w International Brotherhood of Teamsters

By: _____     Date: _____

(Business Manager)


The undersigned Association hereby accepts the application of the above named Employer for membership in the Association pursuant to the terms set forth above.

**FOR THE ASSOCIATION:**

By: _____     Date: _____

(Association Representative)


[.] Construction Industry Council

☐ Building Contractors Association


39

## HEAVY CONSTRUCTION AGREEMENT
### (Independent Employer)

The undersigned Employer hereby agrees to be bound by all of the terms and conditions set forth in the Heavy Construction Agreement presently in effect between Teamsters Local 456, affiliated with the International Brotherhood of Teamsters, and the Construction Industry Council of Westchester and The Hudson Valley, Inc. and the Building Contractors Association of Westchester and Mid-Hudson Region, Inc. as the same may be amended, modified or extended from time to time.

**FOR THE INDEPENDENT EMPLOYER:**

_____
(Name of Employer))

_____
(Address of Employer)

By: _____    Date: _____
      (President)

Telephone Number: _____

Fax Number: _____

Federal ID#: _____

**FOR THE UNION:**
Teamsters Local 456 a/w International Brotherhood of Teamsters

By: _____    Date: _____
      (Business Manager)

40

BEFORE THE
AMERICAN ARBITRATION ASSOCIATION
------------------------------------------------------------------X

LOCAL 456, IBT,

                Union,

        -against-

ALL ROCK CRUSHING, INC.,

                Employer.
------------------------------------------------------------------X

**NOTICE OF INTENTION
TO ARBITRATE**

SIRS:

    **PLEASE TAKE NOTICE** under Section 7501 et seq of New York Civil Practice Laws and Rules, that pursuant to the agreement in writing between the parties, the undersigned intends to proceed to arbitration of the dispute between the said parties as to the employer's failure and refusal to utilize the referral hall and pay the contractual wages and benefits.

    **PLEASE TAKE FURTHER NOTICE** that unless within twenty (20) days after service of this Notice of Intention to Conduct an Arbitration, you serve a Notice of Motion to Stay the Arbitration herein, you shall thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

Dated: December 19, 2006

                Wendell V. Shepherd
                Barnes, Iaccarino, Virginia, Ambinder &
                Shepherd, PLLC
                Attorneys for Local 456, IBT
                258 Saw Mill River Road, 2nd floor
                Elmsford, NY 10523
                (914) 592-5740

To:    All Rock Crushing, Inc.
       465 Yorktown Road
       Croton on Hudson, NY 10520
       (914) 271-8393

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Road
Elmsford, New York 10523
(914) 592-5740
Fax: (914) 592-3213

111 Broadway
Trinity Centre
Suite 1403
New York, New York 10006
(212) 943-9080
Fax: (212) 943-9082

December 20, 2006

Lauren Wilson, Director
American Arbitration Association
1633 Broadway, 10th floor
New York, NY 10019

> Re: Local 456, IBT – All Rock Crushing, Inc.
> Failure and refusal to utilize the referral hall and
> pay the contractual wages and benefits

Dear Ms. Wilson:

This firm is counsel to Local 456, IBT. The Union is party to a collective bargaining agreement with All Rock Crushing, Inc. A dispute has arisen between the parties concerning the employer's failure and refusal to utilize the referral hall and pay the contractual wages and benefits.

The Union requests that a panel of arbitrators be provided for the parties' selection. I have enclosed a copy of the Notice of Intention to Arbitrate. This Notice was served upon the employer on December 20, 2006. The Union requests that the arbitration hearing be held in Westchester County.

Yours truly,

Wendell Shepherd

WS:dr
cc:    Local 456, IBT
       All Rock Crushing, Inc.

**AMERICAN ARBITRATION ASSOCIATION**
**Case No. 13 300 02901 06**
------------------------------------------------------------x

**All Rock Crushing, Inc.,**

    Employer

  -and-           **OPINION AND**
                 **AWARD**

**Local 456, International Brotherhood**
**of Teamsters,**

    Union

**Re: Failure to Utilized Referral Hall and Pay Contractual Wages**
------------------------------------------------------------x

Before: Susan J. Panepento, Arbitrator

Appearances:

    For the Employer:
    George S. Kokkalenios, Esq.
    Law Offices of George S. Kokkalenios

    For the Union:
    Steven H. Kern, Esq,
    Barnes, Iaccarino, Virginia, Ambinder & Shepherd, LLC


    The above-named parties designated the undersigned Arbitrator to hear this

dispute. A hearing was held in this matter on August 3, 2007 and November 29, 2007.

Both parties were advised by the American Arbitration Association (AAA) by mail of the

first hearing date, but only the Union appeared and presented evidence. After that date,

the Arbitrator advised the Employer, by letter, that the hearing had proceeded in its

absence. Sometime thereafter the Employer contacted AAA and the Arbitrator and

requested an opportunity to present evidence in this matter. After conferring with the

parties, the Arbitrator scheduled a second day of hearing. On November 29, 2007, both
parties appeared before the Arbitrator. The Employer stipulated to certain facts, agreed
to accept Union counsel's oral summary of the evidence presented at the first day of the
hearing and waived its right to cross-examine the Union's witnesses, except for rebuttal.
In addition, the Employer was given the opportunity to present testimony and evidence.
As a result, both parties were afforded a full opportunity to present witnesses, submit
evidence, and present arguments in support of their respective positions. The record was
closed upon completion of the second day of hearing. The Arbitrator fully considered all
the evidence presented and the parties' arguments in preparation and issuance of this
Opinion and Award.

## ISSUES

The parties stipulated to the following issues:

Whether the Employer violated the collective bargaining agreement by
failing to utilize the union's referral hall and pay contractual wages and
benefits on November 25, 2006, December 2, 2006, and December 9,
2006 and since Jeffrey Beck was laid off?

Whether the Employer failed to recognize the Union as the collective
bargaining agent for its employees and/or employ union members as
required by the collective bargaining agreement on November 25, 2006,
December 2, 2006, and December 9, 2006 and since Jeffrey Beck was laid
off?

Whether the Employer laid off Jeffrey Beck in violation of the collective
bargaining agreement?

If so, what shall be the remedy?

## RELEVANT CONTRACT PROVISIONS

The Employer and Union are parties to the Heavy Construction Agreement ("Agreement"), effective from June 1, 2005 through May 31, 2008. The Employer agreed to be bound by the Agreement on January 15, 2005. Union Ex. 2. Relevant portions of the Agreement are set forth below:

### ARTICLE I – UNION RECOGNITION

1.  The Employer hereby recognizes the Union as the sole and exclusive collective bargaining agent for employees employed by the Employer in its present establishments or those thereafter opened by the Employer in Westchester or Putnam Counties for employees in the following classifications:
    Chauffeurs on straight trucks, trailer tractors (all types), 3-axle trucks (physically load and unload), Euclids, . . . working Teamster foremen and employees in each and every classification represented by the Union.

2.  All employees covered by this Agreement, who are members of the Union, shall maintain membership in good standing in the Union as a condition of continued employment.

3.  All current and future employees covered by this Agreement, who are not members of the Union, shall become members of the union in good standing on the ninetieth (90th) day from: (a) the date they first commenced work, (b) the date of execution of this Agreement or (c) the effective date of this Agreement, whichever is later.

\*    \*    \*

5.  The Employer shall notify the Union in the event the Employer needs additional help, and the Union shall refer applicants without discrimination as to their membership or non-membership in the Union, and the Employers shall have the right to determine which of said persons referred by the Union shall be employed. In due consideration to seniority with the Employer, the Employer's request for a particular person, the qualifications of the applicant to operate the equipment, the prior experience of the applicant in the industry, the applicant's competence to perform the work and the duration of the applicant's period of unemployment.

\*    \*    \*

3

7.  The Employer agrees to contact the Union for workers either the day before or the morning of each day workers are needed, and referrals will be made according to the factors set forth above. If the Union is unable to supply workers, the Employer will be notified as soon as possible to avoid down time and to make other arrangements.

## ARTICLE IX – PAST BENEFITS

2.  Work presently being performed by bargaining unit employees shall continue to be performed by bargaining unit employees in accordance with the provisions of this Agreement. Equipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of the Agreement.

## ARTICLE XXI – OUTSIDE CONTRACTS

1.  The Employer shall not, during the term of this Agreement, contract or agree to contract or otherwise assign work performed by employees covered by this Agreement to any other firm, contractor, corporation, partnership, individual or otherwise, except as provided by Article VII hereof. It is agreed that employees covered by this Agreement shall continue to do all types of work heretofore performed by them. The Employer shall use employees covered hereby to transport cranes, cats or shovels.

## ARTICLE XXVI – WORKING CONDITIONS

2. (f)  Restrictions: Employers may not carry fuel for equipment in fifty gallon drums or five gallon cans unless a driver is employed and the above requirements are adhered to.

*   *   *

5.  The starting and checking of all trucks and equipment covered hereby shall be performed by employees covered hereunder.

6.  The Employer shall use equipment covered by this Agreement and operated by employees covered hereby for the purposes of delivering materials, parts, cones, planks or any equipment or material for construction or towing, where such equipment can be used for such purposes, in the judgment of the Union delegates.

4

In addition, the Agreement sets forth basic minimum wages and fringe benefit
contributions (Welfare, Pension, Legal Services, etc.) that the Employer must pay to or
on behalf of each covered employee for each hour worked. (Article II.)

## BACKGROUND

The following facts were stipulated: The Employer is a drilling and blasting
contractor. Currently, its business mainly consists of drilling and blasting stone and rock
for residential purposes. While employed by the Employer, Jeffrey Beck was a driver of
a tri-axle dump truck and tag-a-long trailer. During the course of his employment, Beck
transported equipment and materials, such as drills, excavators and pea gravel, to and
from the Employer's yard to work sites. Beck was also the Union's shop steward for the
Employer. On or about December 15, 2006, Beck filed a grievance asserting that the
Employer had made deliveries on the three prior Saturdays without calling Beck or
another Union driver to operate the truck. In either late January or early February 2007,
Beck was laid-off by the Employer and has not been rehired since.[1]

The Union presented testimony of three witnesses: Jeffrey Beck, Christopher
Ahlstedt and business agent, Kevin Curry. Beck testified that he was employed full time

---

[1] The Union asserted that the date of Beck's layoff was February 2, 2007.
Initially, the Employer stated that it could not verify the date of layoff and asserted that it
had been earlier than February 2007. Shop Steward reports, completed by Beck and
submitted into evidence, indicate that Beck worked through January 27, 2007. In
addition, the Employer's witness, Daniel Muro, testified that Beck was laid off in early
February 2007. However, the parties agreed that determination of the date Beck last
worked can be resolved when determining the remedy.

5

by the Employer. Shop Steward reports he completed in 2006 were entered into
evidence and show that he consistently worked 40 hours a week and often worked
overtime.[2] Further, when he was not driving the truck, Beck supervised the laborers in
the yard, fueled trucks and helped with truck maintenance. Union Business Agent Kevin
Curry also testified that under the Agreement, unit members are responsible for more
than just driving the trucks. The Agreement covers work such as yard work, fueling, and
assisting with truck maintenance, etc.

Beck testified that in December 2006 he was advised by Curry to investigate and
see if the Employer was using its truck on Saturdays without a Teamster driver. Shortly
thereafter Beck asked Gabriel D'Addana, All Rock co-owner, if someone was using the
truck on weekends. According to Beck, D'Addana said, "Maybe you don't understand,
but it's my fucking truck. If I want to use it on weekends, I use it. You and your Union
brothers can kiss my butt." Beck replied that D'Addana was supposed to call him in for
overtime if they were working on weekends and told him that he had been told to look
into the issue by Curry. D'Addana said that he was not going to pay time and a half.

A few days later, Beck was called to the office after work. Present were Daniel
Muro, co-owner, Jeanette _____, the office manager, and Michelle _____, who works in
the office. Muro said to Beck, "You cause me a lot of problems. If I get one more letter
from your hall about the Saturdays and the truck, you're fired. Get out." The Grievant
replied that he was just doing what he was told to do. Muro responded, "Just get out."

---

[2] 2006 Shop Steward reports completed by Beck show that he worked between
one and ten hours of overtime in at least 22 out of 38 reported work weeks.

Sometime in January, D'Addana told Beck that he had to accept cash for his overtime work. Beck replied that he couldn't take cash. D'Addana then said, "Well then, they'll be some changes here." According to Beck, when he went to the office to pick up his paycheck on February 2, 2007, he was met by Muro, who handed him two envelopes and said, "This is your pay and this is your last week." Beck replied, "What happened? There is work." Muro said, "I told you, I'm not dealing with you, I'm not dealing with the Teamsters. I have no work for you." Beck recalled that Muro also said something like – "you cost me a lot."

Beck testified that after February 2, 2007, there was still delivery work that needed to be done at a location in Rye/Harrison, New York where he had delivered a drill just prior to his layoff. In addition, Beck was told by other drivers that they had seen the All Rock truck on jobsites on weekends from December 2006 to February 2007. After February 2007, Beck observed D'Addana driving the All Rock truck or flat bed to various work sites. Specifically, on May 7, 2007, Beck saw D'Addana drop an excavator at a residence; on May 8, 2007, he saw D'Addana bring a trailer into the yard; on May 11, 2007, Beck saw D'Addana driving the 3-axle truck in Montrose, N.Y.; on May 22, 2007, he saw D'Addana driving a truck filled with dirt in Chappaqua, N.Y.; and late in May 2007 he saw D'Addana driving the truck in Harrison, N.Y. In addition, Beck observed All Rock employees working on a job site in Mahopac, N.Y. in late June 2007. Beck testified that he has driven by the yard at least once a week since his layoff and each time he observed employees and materials in the All Rock yard.

7

Curry testified that he was informed by some unemployed Teamsters in December 2006 that All Rock was making weekend deliveries without a Teamster driver. As a result, he called Beck and asked him to ask Muro about it. Beck reported back to him that D'Addana told him it was none of his business. Curry instructed Beck to file grievances for three Saturdays. Subsequently, Curry spoke to Muro on the phone and Muro told him that he had no more work for Teamsters. Curry asked him if he was going out of business and Muro said, "No." Sometime thereafter, Curry tried to set up a meeting with Muro to discuss the issue further, and Muro refused and told him, "Screw you." These conversations occurred before Beck was laid off. After Beck was laid off, Curry, who regularly visits job sites in Westchester and Putnam counties, continued to see the Employer's drills and trucks at jobsites on a regular basis.

Christopher Ahlstedt, a former All Rock employee, testified that he is a driver for a fuel company and has been delivering fuel to construction sites in Westchester and Putnam counties since before February 2007. Therefore, he is on construction sites in Westchester and Putnam counties daily. After Beck was laid off, Ahlstedt testified that he frequently saw All Rock trucks and employees on construction sites performing blasting and drilling work. Ahlstedt stated that he saw D'Addana driving the All Rock truck on construction sites over 100 times since February 2007

Both Muro and D'Addana testified on behalf of the Employer. Muro testified that when he established All Rock Crushing in 1999, the business objective was to engage in rock crushing and processing.[3] In 2002, Muro's partner left the business and Muro gave

---

[3]    Initially, Muro co-owned the company with Bruce Fiorino.

8

50% of the shares of the Employer to his nephew, D'Addana, who became the company
president. Muro retained 50% of the shares and became vice-president. Thereafter, the
nature of the business changed to drilling and blasting and the crushing operation was
diminished. According to Muro, crushing is currently only a very small fraction of the
Employer's work. Muro stated that the Employer also does some minor material sales to
small contractors or landscapers. This work involves only storing and sorting stone. The
Employer no longer delivers or transports stone.

Muro testified that after 2002, D'Addana took over the "main management" of
the business and the amount of work that the business performed decreased due to
aggressive competition. As a result, the Employer suffered financial problems. Muro
stated that he could no longer afford to keep Beck due to these financial difficulties.
Around February 2, 2007, Muro told Beck that he was laid off and gave him his final pay.

Muro testified that since Beck's layoff, work has been "scarce." There have been
2-3 month periods when the Employer has had no blasting work. Further, the Employer
has not had any large jobs, only one medium job and a few small jobs involving mostly
drilling. In addition, he said that the Employer is "turning away from Union jobs,"
"downsizing and restructuring."

In sum, Muro stated that since February 2007, the work the Employer has
performed did not require employment of a Teamster. With only one or two work sites
in progress at a time, there was no need for a driver to move equipment between work

9

sites.[4] Initially, Muro testified that since its inception, only 5% of the Employer's work required use of the truck to transport equipment. Later in his testimony, he stated that before 2001, the Employer had lots of work and the truck was used to move equipment 2-3 days a week, whereas now a drill is moved only once a week or less often. Also, Muro stated that lately other contractors move his drills from site to site. Often these contractors employ Teamster drivers who transport his drill between work sites. For example, Joachim Construction moved All Rock's drill after Beck was laid off. Further, Muro explained that the All Rock drillers and blasters keep tanks of fuel in their trucks and refuel the drills/excavators on the work sites.

With respect to the three Saturdays in 2006, when the Union claims the Company should have called Beck to drive the truck, Muro stated that Beck knew that D'Addana was using the truck on those dates to do some work at his home. Further, Muro stated that he had been unhappy about receiving Beck's grievance, and acknowledged telling Beck that he didn't want to hear about it. When asked why he did not tell Curry what the truck was being used for, Muro replied that Curry did not call him until after the fact. Muro also claimed that Curry had threatened him.

With respect to the parties' Agreement, Muro gave varying accounts of why he signed the Agreement. Initially, he stated that he signed the Agreement after meeting with the Union president at the Union office. At that time, the president told him that he needed to have a Teamster driver, but he did not have to employ the driver full-time.

---

[4] Muro also stated that there are four other blasting contractors who operate without a Teamster.

10

[Sometime after signing the Agreement, Muro said he was told by the Union that he needed to employ a Teamster full-time, and had to pay him 40 hours per week.]  Later in his testimony, Muro said that he was forced to sign the Agreement because Union representatives sat in his office and said that they would not leave until he signed the Agreement.

D'Addana testified that he is responsible for estimating jobs, laying out the work and moving equipment.  On two of the Saturdays in issue, (he was not certain which ones), he used the All Rock truck to pick-up gravel and soil and deliver it to his house to complete his driveway.  D'Addana stated that since Beck's layoff, he has driven the truck and trailer to deliver equipment including drills to job sites.  He was not certain how many times he used the truck to deliver equipment, but stated it was more than once or twice and could have been, "30, 40 or 50 times."

## POSITIONS OF THE PARTIES

### The Union

The Union argues that the Employer has violated the parties' Agreement in several ways.  First, in Article I, Section 1 of the Agreement, the Employer agreed to recognize the Union as the collective bargaining agent for its employees who drive tractor trailers and 3-axle trucks, yardmen, helpers, employees who drive pick-up trucks and fuel trucks ("covered employees.")  By its failure to employ any employees who are members of the Union to perform these duties on November 27, December 2, and December 9, 2006 and continuously since February 2, 2007, the Employer has violated

11

this provision of the Agreement. There is no dispute that the Employer has continued to operate its business and that at a minimum its operation requires the use of a truck and trailer to transport drills.

Second, the Union argues that the Employer has violated Article I, Sections 2 and 3 of the Agreement, by failing to employ employees who are or who become members of the Union to perform work covered by the Agreement. Article I, Sections 2 and 3 require employees who perform covered work to become and maintain membership in good standing in the Union.

Third, Article I, Sections 5-7 require the Employer to utilize the Union's referral system to obtain employees who operate equipment or perform services covered by the Agreement. The Employer's failure to contact the Union to obtain a Teamster to drive the truck and trailer on November 27, December 2, and December 9, 2006 and continuously since February 2, 2007 violates these provisions.

The Union argues that the Employer has continued to operate its business and in so doing has performed drilling and blasting work which required the use of an employee covered by the Agreement. The Union notes that the Agreement covers both yardmen and fuel truck drivers and the Employer did not state that there was none of this work available. To the contrary, Muro testified that drillers and blasters carried 100 gallon tanks of fuel in their trucks. Article XXVI, Section 2(f) of the Agreement expressly prohibits the Employer from carrying fuel for equipment unless a driver is employed. Further, Muro testified that the Employer still sorts stone for landscapers, work that is performed by yardmen. Finally, the Union argues that the Employer cannot use other

12

contractors to perform work that it covered under the Agreement. Muro testified that the Employer has used other contractors such as Joachim to transport the All Rock drill between job sites. Article XXI of the Agreement prohibits the Employer from assigning work performed by employees covered by the Agreement to any other firm, contractor or corporation.

In sum, the Union argues that it has established violations of the Agreement. It contends that to prove its case it does not have the burden to show each and every instance that the Employer performed covered work, but failed to employ a Teamster and/or utilize the Union's referral service. The nature of the Employer's drilling and blasting operation requires the movement of equipment and materials to and from worksites and the Employer's yard. It is illogical to conclude that the work could be completed otherwise. The Union provided some specific examples of work that the Employer performed since February 2007. In addition, D'Addana admitted that he himself has driven the truck and trailer numerous times since February 2007. These facts along with the fact that the Employer has continued to operate its business establishes that the Employer violated the Agreement.

Finally, the Union argues that with respect to November 27, December 2, December 9, 2006, the Employer did not notify the Union that the work being performed was at the owner's residence or agree to meet with the Union to discuss the matter. This demonstrates a lack of good faith by the Employer and its assertions should therefore not be credited. Neither Curry nor Beck knew what the truck had been used for, but were

13

reasonably relying on reports that the truck was seen on jobsites when the grievance was filed.

The Union requests that Beck be made whole for the loss of overtime pay for work performed on November 27, December 2, and December 9, 2006. In addition, it requests that the Employer be ordered to cease and desist from its failure to use the Union's referral service. Finally, the Union requests that Beck be made whole for lost wages and benefits as a result of his layoff.

**The Employer**

The Employer asserts that the Union has not presented sufficient or reliable evidence to establish that work was performed on November 27, December 2 or December 9, 2006 or on any other date after Beck's layoff that required the hiring of a Teamster under the Agreement. The Union did not present specific evidence concerning what work was performed or where the work was performed and therefore did not meet its burden of proof.

Further, the Employer argues that after the layoff of Beck, business declined and it did not have enough work for a Teamster. It claimed that there had not been full-time work for Beck for a while prior to February 2, 2007; nevertheless it was required to pay Beck for 40 hours per week regardless of the amount of work available. Moreover, the Employer argues that the Agreement is silent concerning the ability of an owner/operator to drive the truck and trailer. Because the Agreement does not expressly address the issue of owner/operators, the Employer asserts that it had the right to layoff Beck for lack of work and to continue to use the truck and trailer driven by the owner. Simply, the

14

Employer argues that under the circumstances, the Agreement does not require it to employ a Teamster to drive the truck and trailer.

## DISCUSSION

A portion of the first and second stipulated issues arise from the Union's claim that the Employer used its truck to transport equipment and/or materials to or from jobsites without a Teamster driver on November 27, December 2 and December 9, 2006. Neither Curry nor Beck, who both testified, saw the All Rock truck on any jobsites on the dates in question. The Employer's regular business operates Monday through Friday. The evidence presented concerning these weekend incidents is hearsay, which standing alone is unreliable. As a result, the Arbitrator cannot sustain the Union's claim that the Employer violated the Agreement by failing to utilize the Union's referral hall, pay contractual wages and benefits or by failing to recognize the Union as the collective bargaining agent for its employees and/or employ union members as required by the Agreement on November 25, 2006, December 2, 2006, and December 9, 2006. Accordingly, in this respect the grievance is denied.

The remainder of the first and second issues and the third issue concern whether the Employer violated the Agreement by its layoff of Beck and whether since the layoff it failed to utilize the Union's referral hall, pay contractual wages and benefits, failed to recognize the Union as the collective bargaining agent for its employees and/or failed to employ union members. By the terms of the Agreement, the Employer recognized the Union as the exclusive bargaining representative of employees performing such tasks as

15

driving 3-axle trucks and tractor trailers and performing yard work. Art. I, Sec. 1. In addition, the Agreement requires the Employer to use the referral services of the Union to obtain employees to perform these defined or "covered" duties. Art. I, Sec. 5. Moreover, the Agreement prohibits the Employer from assigning "covered" work to another contractor (Article XXI) and further prohibits the Employer from allowing its employees to carry fuel tanks and fuel their own equipment, unless a Teamster is employed. (Article XXVI(f).) As a result, the Arbitrator rejects the Employer's assertion that it is not required to use the Union's referral service or employ a Union member because its owner is doing the driving. The Agreement makes no exception to the above-mentioned rules when an owner is driving the truck and trailer or when there is a decline in the employer's business. Rather, the unambiguous language states that "[e]quipment operated by the Employer, or on his behalf, whether owned by the Employer or operated pursuant to lease, hire or contract, shall be operated by members of the bargaining unit or employees hired through the Referral Hall in accordance with the provisions of the Agreement." Art. IX. Sec. 2. Further, the driver of a vehicle covered by the Agreement is required to be a Union member or become a Union member within a specified time, and is entitled to the all the wages and benefits specified in the Agreement for drivers. By using D'Addana to drive the truck and trailer, the Employer did not comply with any of these provisions of the Agreement.

There is no dispute that after Beck was laid off, the Employer continued its drilling and blasting operations. Curry, Beck and Ahlstedt testified that after February 2, 2007, they continued to see the Employer's truck and employees on jobsites throughout

16

Westchester and Putnam counties. The Employer did not rebut this testimony. Instead, D'Addana admitted that he drove the truck numerous times and delivered equipment and drills to job sites. In addition, Muro admitted that after February 2, 2007 there was some sorting work done by employees in the yard. Therefore, it is undisputed that the Employer continued to perform work that is covered by the Agreement.

In addition, the Arbitrator is not persuaded that any diminution in the Employer's business justified Beck's layoff. In this regard, the Arbitrator credits Beck's testimony that when he was laid off, Muro said, "I told you, I'm not dealing with you, I'm not dealing with the Teamsters. I have no work for you." Beck's testimony regarding this conversation was clear and was consistent with the remainder of his testimony that Muro and D'Addana were angry with him for filing a grievance. Indeed, Muro admitted that he was not happy with Beck for filing the grievance. In contrast to Beck's testimony, Muro's assertion that the layoff was due to lack of work was not credible. As stated earlier, it is undisputed that the Employer continued its drilling and blasting operations after Beck was laid off. The operation of this business required the transport of drills and materials to and from work sites. Second, in general, Muro's testimony was confusing and often contradictory or non-responsive to the questions asked. For example, he testified that since 2001 D'Addana was primarily responsible for the management of All Rock. However, Muro, not D'Addana, testified concerning All Rock's decline in business and ultimately, it was Muro, and not D'Addana, who laid off Beck. Therefore, the Arbitrator does not credit Muro's assertion that Beck was laid off for lack of work.

17

Although, the Employer's business may have decreased and/or continued to decrease after Beck's layoff, Muro's testimony concerning the decline in work was vague and unquantifiable and was insufficient to prove this defense.

The Arbitrator does not find that the Union needed to prove each and every instance in which work covered by the Agreement was performed. It was undisputed that after Beck's layoff the Employer's operation continued to involve work that is covered by the Agreement. The Employer admitted that it continued to perform work that required the transportation of drills and therefore the use of its truck and trailer. In addition, Beck testified that he delivered a drill to a job shortly before his layoff, which would later require retrieval. Therefore, the Employer was obligated to employ a Teamster to perform that work and violated the Agreement when it failed to employ Beck or another driver referred by the Union to perform work covered by the Agreement.

In sum, since Jeffrey Beck's layoff, the Employer violated the Agreement by failing to utilize the Union's referral hall and pay contractual wages and benefits. Similarly, since Beck's layoff, the Employer failed to recognize the Union as the collective bargaining agent for its employees covered by the Agreement and failed to employ Union members as required by the Agreement. Finally, the Employer's failure to employ Jeffrey Beck or another driver referred by the Union after the date Beck was laid off violated the Agreement

With respect to the remedy for the above-described violations of the Agreement, the Employer made no claim that Beck was or is unfit for employment. Therefore, it shall make whole Beck for what he would have earned since his layoff had the Employer

18

complied with the terms of the Agreement, less interim earnings. In addition, the

Employer shall cease and desist from its failure to recognize the Union, to pay

contractual wages and benefits, to use the Union's referral service and/or to employ

Union members to perform work covered by the Agreement.

## AWARD

The grievance is granted in part and denied in part. The Employer shall make

whole Beck for what he would have earned since his layoff had the Employer complied

with the terms of the Agreement, less interim earnings. In addition, the Employer shall

cease and desist from its failure to recognize the Union, to pay contractual wages and

benefits, to use the Union's referral service, and to employ Union members to perform

work covered by the Agreement.

Dated:  January 8, 2008
       Brooklyn, New York

                            Arbitrator

I, Susan J. Panepento, do hereby affirm upon my oath as Arbitrator that I am the
individual described herein and who executed this instrument, which is my Opinion and
Award.

Dated:  January 8, 2008
       Brooklyn, New York

Susan J. Panepento
Arbitrator

19

$U - X - 8$

## AMENDMENT
## TO THE
## TEAMSTERS LOCAL 456
## HEAVY CONSTRUCTION AGREEMENT

### OWNER OPERATOR

Teamsters Local 456 (Local 456) and the undersigned Owner Operator/Employer
(Employer) adopt and are bound by all of the terms of the Teamsters Local 456 Heavy
Construction Agreement, and any amendment, with the following modifications:

1) The Employer agrees to post a surety bond or to submit a check, to be held in
   escrow by the Local 456 Benefit Funds, in the amount of $25,000, to guarantee
   contributions to the Local 456 Benefit Funds.
2) The surety bond or the escrow will become due at any time that the Employer is
   delinquent in contributions to the Local 456 Benefit Funds in an amount in excess
   of $25,000.
3) This Agreement will be considered null and void upon unilateral notification from
   Local 456, if the Employer's contributions to the Local 456 Benefit Funds are
   delinquent in an amount in excess of $25,000.
4) The Employer agrees to contribute to the Local 456 Benefit Funds for a minimum
   of 1,500 hours each contract year.
5) The Employer will be given an eight (8) hour credit towards the 1,500 hour
   Benefit Fund contribution requirement for each day of unemployment during each
   contract year, so long as the Employer calls the Local 456 Hiring Hall for work,
   and does not refuse to accept employment through the Local 456 Hiring Hall.
6) If the Employer hires or employs one or more drivers, the provisions of the
   Construction Hauling Agreement will supersede this Agreement. (See attached)

Agreed To:

_____        Teamsters Local 456
        Name of Employer

By: _____        By: _____
        Authorized Signature

Date: _____        Date: _____